STATE of Minnesota, Respondent,

v.

George Fred GRUBER, Appellant.

No. 46679.

Supreme Court of Minnesota.

March 31, 1978.

C. Paul Jones, Public Defender, Rosalie E. Wahl, Spec. Asst. Public Defender, Phebe S. Haugen, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Keith M. Brownell, County Atty., Peter M. Banovetz, Asst. County Atty., Richard C. Hansen, Reg. Pros., Duluth, for respondent.

Heard before KELLY, TODD, and IRVINE, JJ., and considered and decided by the court en banc.

TODD, Justice.

George Gruber spent August 18, 1975, in the company of Ken and Phil Aubol. They drank most of the day. That evening, while all three were obtaining gasoline at a Duluth service station, Ken Aubol engaged in an argument with the owner, Michael Rocheleau, whom he shot and killed. Gruber was indicted for aiding in the commission of the crime of murder in the first degree. Over objections of defense counsel, the trial court submitted to the jury the lesser included offense of manslaughter. The jury found Gruber guilty of aiding in the commission of the crime of manslaughter committed in the heat of passion. Under the facts of this case, we reverse and remand to the district court with instructions to enter a judgment of acquittal.

Gruber had been acquainted with Ken and Phil Aubol for a number of years. He regarded Phil as his friend. On August 18, 1975, the three were together and engaged in extensive drinking. During this time, Ken Aubol asked Gruber if he still had a .32-caliber pistol. Gruber indicated he did and agreed to give it to Ken Aubol to satisfy an old indebtedness. The gun was delivered, fully loaded, with knowledge on Gruber's part that Ken Aubol would not hesitate to use the gun for illegal purposes.

During the course of their drinking, Ken Aubol also asked Gruber if he still had the keys to a 1970 Chrysler automobile Gruber had tested at a used car lot about a week earlier. Gruber, who had inadvertently failed to return the ignition keys, gave the keys to Ken Aubol and drove him to the used car lot. Ken Aubol stole the vehicle.

After the car theft, the three went to Shannon's Bar in Duluth. Ken Aubol drove the stolen Chrysler, and Gruber and Phil Aubol drove Gruber's flatbed truck. After spending some time in the bar, they drove across the street to the M & C gas station owned and operated by Rocheleau. Gruber had known Rocheleau for several years. Rocheleau was an argumentative person who particularly objected to anyone pumping their own gas at his station. Ken Aubol drove the Chrysler to one set of pumps and Gruber parked his truck at another set of pumps. Ken Aubol proceeded to pump his own gas. Rocheleau yelled and swore at him and took over the pumping of the gas. Gruber allowed Rocheleau to pump the gas into his truck. Gruber also raised the hood of his truck, checked the oil, and indicated to Rocheleau that he needed a quart of oil. Rocheleau and Ken Aubol continued their argument. Both went into the service station.

Gruber testified that he then heard a noise like a loud "pop." He ran to the door of the station and saw Rocheleau being shot in the head. Ken Aubol was in the station. Gruber stated that Phil Aubol, who had been in the cab of the truck, then rushed

past him into the station. Gruber immediately returned to his truck and put the hood down, throwing the oil cap, which had been removed, onto the floor of the cab. As Gruber started to leave, Phil Aubol ran to the truck and jumped in. Phil Aubol was bleeding. Gruber proceeded toward Interstate Highway No. 35 but was stopped and arrested by police officers a few minutes later.

Gruber gave a statement at police headquarters consistent with his testimony at trial except that in his first statement he denied any knowledge about the stolen car or the gun. In his second statement, he admitted giving the gun and car keys to Ken Aubol.

Ken Aubol made an oral confession to Detective Richard Yagoda in which he admitted the shooting. Yagoda testified that Ken Aubol stated he had no intention of killing Rocheleau but did so solely as a result of their heated argument. He further stated to Yagoda that neither Gruber nor Phil Aubol knew anything about the killing. He did claim that Gruber was the person who assisted him in moving the body. At trial, defense counsel advised the court that Ken Aubol's statement was admissible at trial as an admission against penal interest and an exception to the hearsay rule. Defense counsel failed to recognize defendant's right of confrontation under the Sixth Amendment which would have allowed him to strike the accusatory portion of the oral confession.[1]

The state presented a number of witnesses whose testimony was inconsistent and conflicting. The first person to observe the argument between Ken Aubol and Rocheleau was Roger Carlson. Carlson stopped at the station to buy cigarettes shortly after 10:30 p. m. He witnessed the verbal altercation between Ken Aubol and Rocheleau and then drove across the street to buy his cigarettes at Shannon's Bar.

The first person in Shannon's Bar to become aware of the commotion at the station was Edna Illikainen. She testified that she was purchasing cigarettes from the cigarette machine by the front door of the bar when she heard a loud argument coming from the filling station across the street. She went to the doorway of the bar and saw Ken Aubol and Rocheleau arguing and heard them shouting obscenities at each other. She then saw Ken Aubol go into the station building and stand by the counter cabinet. Rocheleau then walked into the building, and as he did so, Ken Aubol raised his pistol and shot him. Illikainen stated she heard a second shot "right away," just after Rocheleau fell to the floor. She testified that she saw no one else in the station building at this time. She then yelled, "Somebody call the police because a man has gotten shot." No one else was looking at the station at this time. After she yelled, she was pushed from the door by other bar customers and did not see anything further until the car and truck pulled out of the station.

Bruce Brown was also a customer at Shannon's Bar that night. After hearing someone yell, "There're shooting, or they have a gun," or something to that effect, he went to the window of the bar and looked toward the station. He stated he saw only one person walk out of the gas station building and very nonchalantly get into the car and drive away. He saw no truck at this time, only a car. He stated he did not see anyone else at the station.

Fern Somers was also a witness called by the state. She testified that after her attention was drawn to the M & C station, she went to the front door of the bar. She saw the car and truck and the back of a man's head, but that was all. She did not hear any shots or recognize the man whose head she saw.

Irvin Wicklund was also in Shannon's Bar on the night of the killing. After hearing

---

1. When Gruber's trial began, Phil and Ken Aubol had not yet been tried. Their attorney had advised that they would invoke their Fifth

Amendment rights if called as witnesses. The confession was introduced without objection by the testimony of a police officer.

the commotion on the other side of the bar, and watching everyone look out into the street, Wicklund went out the front door and onto the sidewalk in front of the bar. He testified that he did not observe anyone in the station building, but stated that he saw one person outside the building heading for a car and two other people heading for another vehicle. He said that when they got to the vehicles, it seemed as though they paused and went back toward the building. He testified that the person who got into the car had a cloth in his hand and that perhaps one other person also had a cloth in his hand. He saw nothing else. He heard no shots and could not identify any of the men at the station.

Boyden McDonald, the bartender and owner of Shannon's Bar, said that he saw three men through the window of the bar standing outside the M & C station. He saw no one enter or leave the station building. He stated that it seemed as though "they stood there and talked for a few minutes, and then all of a sudden" they drove away. He did not hear any shots. McDonald recognized Gruber as one of the three men who had been in his bar earlier that evening.

Charles Carter testified that after hearing someone shout "the M & C is being robbed," he went to the door of Shannon's Bar and looked across the street toward the station. From that vantage he observed three men inside the station building. None of those men, according to Carter, was Rocheleau. Carter left the doorway and went to call the police. As he started dialing, he heard a shot. While telling the police the station was being robbed, he heard another shot. He put the phone down and went to the door to look once again. He saw two men come out of the building, walking at a slow and deliberate pace toward the truck. He testified that they then went back into the building. He then heard a third shot. He saw the two men come out again and get into the truck. He could not identify the defendant as one of the two men.

Keith Ray was sitting in a booth in Shannon's Bar when his attention was directed to the M & C station. Looking through a window in the bar, he saw two men inside the station building and one man standing in the doorway. Ray then moved outside the bar to the left of the front door. From there he saw two men get into the truck and one man get into the car and drive away. He could not identify any of the men at the station. He testified that he did not hear any shots fired.

Karl F. Bergman testified that after he heard someone in Shannon's Bar shout "robbery" or "they're shooting" he went out the front door of the bar. He saw three men in the station building. One man was apparently reaching into a cigarette cabinet. He then saw all three men come out of the building and go to the car and truck. Bergman's testimony, however, was so confused and conflicting when he was questioned on cross-examination that the prosecutor suggested to the jury in closing argument that they "cancel out his testimony."

Donna Eckenberg heard someone say, "Somebody's been shot." There was a lot of commotion. She then heard two shots fired and she went toward the door of the bar. She saw only one man walk out of the station building. She did not know whether he got into a car or a truck. She could not identify the man she saw.

Vern Eckenberg's attention was called to the M & C station when he heard Illikainen yell, "Somebody got shot." After hearing that, he ran outside the bar and hid behind the cars parked in front of the bar. When he first looked at the station he saw only two men, one inside the building and the other framed in the doorway. The third man was outside the station building walking toward the car by the gas pump. The man by the car then came back and walked into the building. All three men were then in the building at one time. He observed two men bending down. He also testified that while all three men were inside, he heard two shots. The men then came out

slowly, one got in the car, two in the truck, and they all drove away.

The final witness to the event was Darrell Eckenberg. He testified that while drinking in Shannon's Bar that night, he heard Illikainen yell that she heard a shot. He turned and looked out the door toward the station. He then moved to a position on the sidewalk just outside the front door of the bar. He saw three men walk out of the station building and then turn around and walk back in. None of the three men was Rocheleau. After the second time they went into the building he heard two shots. Then he saw two men carry the victim to the far corner of the building. He could not identify which two of the three men moved the body. All three men then just walked out of the station and drove away.

There was also a significant amount of physical evidence introduced at trial. There was a great deal of broken glass on the floor of the station building. Both panes of glass of the cigarette cabinet, in the corner where Rocheleau's body was found, had been broken. Glass was also found under the victim's body.

Glass found in both Ken and Phil Aubol's shirts positively corresponded with the glass found in the building. The only glass found on defendant's clothing did not correspond with the glass from the cigarette cabinet.

There was also a great deal of blood found throughout the station building. There was a blood trail from a point near the front door, along the floor through the center of the building, to where the body was found near the rear. The body was lying in "a deep puddle of red substance that appeared as blood." Traces of blood were found on cabinet doors, shelves, and countertops throughout the building and on the glass remaining in the cigarette cabinet.

Phil Aubol was bleeding badly from a gash in his arm when he was apprehended within minutes after leaving the station. Blood found on the floor of the building near the bulk oil dispenser was consistent only with his blood. Blood found on the glass in the cigarette cabinet and on Ken Aubol's clothing was consistent with Ken and Phil Aubol's and Rocheleau's blood type. The only blood found on defendant's clothing was a faint spot on his trousers, too small to determine type or origin.

The state also introduced into evidence several packages of cigarettes found in defendant's truck at the time of his arrest. The tax stamp number on the cigarettes matched those on cigarettes found inside the station. It was shown, however, that cigarettes with the same stamp could have been purchased at a minimum of 150 other locations in Duluth. Also, a box of .32-caliber bullets was found in defendant's truck.

Collectively viewed, the state's evidence presented different versions as to when the shots were fired, where the three men were during this time, and what they did. No one could identify defendant as being in the service station building when the shots were fired. The state concedes that the first shot fired by Ken Aubol was of his own doing, in the heat of passion, and that there was no attempt to commit a robbery. The state sought to obtain a murder conviction and much of its evidence was directed toward premeditation based on the two shots fired after the initial shot. The jury rejected the efforts of the state to establish a murder charge.

The trial court submitted the case to the jury and included the lesser included offenses of murder in the second degree and manslaughter. Defense counsel objected to the submission of the lesser included offense of aiding in the commission of the crime of manslaughter committed in the heat of passion on the grounds that it was not justified under the facts of this case and also that it could not be justified in any case. The court further instructed the jury, over objection, that a person may be convicted of aiding in the commission of a crime by his mere presence, if his presence, inaction, or failure to object to the crime is intended to and does aid the primary actor

in carrying out that crime. Also, the court instructed the jury that companionship and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. The jury returned a verdict of guilty of manslaughter in the first degree.

The errors alleged are:

(1) Were defendant's constitutional rights violated by the admission of testimony by Detective Yagoda concerning the oral confession made by Ken Aubol?

(2) Did the trial court err in instructing the jury to consider the lesser included offense of heat-of-passion manslaughter under the facts of this case?

(3) Is the verdict justified by the evidence?

■ 1. Gruber contends that the failure of his counsel to object to the admission of testimony concerning the confession of Ken Aubol was fundamental error and effectively denied him adequate assistance of counsel. Gruber's argument on this issue carries with it a significant amount of force and merit. Under the traditional rules of evidence, a codefendant's confession inculpating the accused is inadmissible against the accused as hearsay. *State v. Allison*, 175 Minn. 218, 220 N.W. 563 (1928). It is also clear that where the codefendant does not take the stand, the admission of such a statement violates the defendant's right to confront and cross-examine witnesses against him under the Sixth Amendment. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

The state does not argue defendant's right to confront adverse witnesses. It contends, however, that when defendant's attorney failed to object to the admission of the confession, he waived any rights he may have had at that time, and the issue was not properly preserved for appeal. Furthermore, the state maintains that the deci-sion to allow the confession into evidence without objection was a matter of trial tactics.

■ These arguments can be refuted in several ways. First, the failure to properly object to inadmissible evidence is not fatal to an appeal where that failure is plain error, affecting substantial and fundamental rights of the accused. See, Rule 31.02, Rules of Criminal Procedure; Rule 103(d), Rules of Evidence. Because of the damaging nature of the confession and the constitutional dimensions of the trial attorney's failure to object, this court is free to fully consider this issue even though no objection was properly made at the trial court level.

■ Furthermore, the state's contention that defendant's failure to object to the confession was a matter of trial tactics is erroneous. The state argues that defendant's attorney wanted Ken Aubol's statement in evidence to prove that it was Ken Aubol who shot Rocheleau in a wild fit of passion. This would apparently help defendant's case in two ways. First, it would show that defendant had no direct participation in the killing, and second, it would tend to show that at most the killing was a heat-of-passion manslaughter.

The state maintains that once the tactical decision was made to allow Ken Aubol's statement into evidence, it was impossible for defendant's counsel to get that portion of the confession that said Ken Aubol did the killing, without also getting that portion which said the defendant helped him move the body because it was all part of the same confession.

First, contrary to the state's contention, there are several cases which hold that a court, in its discretion, may admit the confession of a codefendant if those portions of the statement implicating the other codefendant can be properly excised without rendering the confession unclear, incomplete, or fragmentary. See, *Bruton v. United States, supra* ; 29 Am.Jur.2d, Evidence, § 540. Thus, as a matter of trial tactics,

defendant could have allowed the confession to be introduced into evidence without objection and still have insisted that those portions implicating him with the crime be deleted. Further, there was never any indication that defendant's attorney wanted the statements admitted as a matter of trial tactics or that he intended to waive his client's right to confrontation; rather, the record indicates that he believed the confession was admissible as an exception to the hearsay rule.

■ It is true that a mere violation of defendant's right to confrontation does not automatically require reversal of a criminal conviction. However, the cases where a defendant's right to confrontation has been violated and the court has still refused to reverse have generally involved facts in which the evidence against defendant was in all other respects overwhelming. See, e. g., *Schneble v. Florida, supra; Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

In the instant case, the evidence is not overwhelming. In fact, the improperly admitted confession could have been "devastating" to defendant's case. See, *Dutton v. Evans,* 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213, 226 (1970). Finally, this court has demonstrated a strong aversion to the admission of such evidence in *State v. Shotley,* 305 Minn. 384, 387, 233 N.W.2d 755, 758 (1975), where we stated:

> "* * * Given * * * the aversion of this court to dilution of the defendant's right to be confronted by witnesses against him, we could not and would not affirm this conviction were it not for the fact that we consider *the testimony as a whole to be overwhelmingly persuasive of defendant's guilt.* * * * Our reservations on this phase of the case are such, however, as to prompt this admonition: The use of testimony of an absent witness * * * jeopardizes the fairness of the trial and may result in a reversal in any case where such testimony is used, unless the evidence of guilt is so strong as to convince us that the * * * testimony * * * did not affect the outcome of the case. For this reason, as a matter of policy, the use of such testimony as substantive evidence should be avoided." (Italics supplied.)

However, because of the disposition we reach in this case, we need not base our decision on the violation of Gruber's constitutional rights.

■ 2–3. Contrary to defendant's contention, there is substantial case authority holding that one not the primary actor of a crime may be found guilty of aiding a heat-of-passion manslaughter, and we accept the reasoning of those cases here. See, Annotation, 95 A.L.R.2d 175. However, because there was insufficient evidence, as a matter of law, to find defendant guilty of that crime under the facts of this case, the charge to the jury of the lesser included offense of aiding in the commission of manslaughter was error.

The state had charged Gruber with aiding in the commission of the crime of murder in the first degree. The trial court included the lesser included offenses of murder in the second degree and manslaughter. The state's evidence was oriented toward the murder charges. The jury rejected this evidence as establishing the guilt of Gruber to the crime of murder. Thus, we must determine if the evidence, considered in the light most favorable to the prosecution, will sustain the conviction for aiding in the crime of manslaughter committed in the heat of passion.

The state is required to prove beyond a reasonable doubt all of the essential elements of the crime charged. The necessary requisites to be convicted of aiding in the commission of any crime are set out in Minn.St. 609.05, subd. 1, which states:

> "A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."

This court interpreted this statute in *State v. Parker*, 282 Minn. 343, 164 N.W.2d 633 (1969). There, Parker and his accomplices had been riding with the victim in the victim's car for some time prior to the crime. Eventually, a brutal aggravated robbery took place, after which Parker, while driving the victim's car, stated that they should "shoot him [the victim] now," and that they should "get rid of him right now," (282 Minn. 347, 164 N.W.2d 636) and with his accomplices helped to beat and hit the victim several times. This beating continued for an extended period of time. Parker was eventually captured with his accomplices after a short police chase. Parker denied his guilt, stating that although he was present during the robbery and subsequent assault, he in no way participated in the crimes. This court upheld the conviction, stating that one may be convicted of aiding the commission of a crime by his mere presence if his presence, inaction, or failure to object to the crime is intended to and does aid the primary actor in carrying out that crime. This court further stated in *Parker* that companionship and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.

In the instant case, the trial court, citing *Parker*, relied a great deal on the evidence presented at trial concerning defendant's presence at the scene of the crime, as well as his conduct before and after the crime, in his instructions to the jury, and in upholding defendant's conviction and refusing his motion for a new trial or dismissal. The facts of the instant case, however, are significantly different from those in *Parker*.

■ We agree that, as a general rule, conduct before and after the crime can be highly relevant and useful in determining whether defendant aided in the commission of a crime. However, as with any general rule of law, it cannot be mechanically applied to every case without due regard for the particular facts and circumstances involved. In the instant case, evidence of prior activity, which may have been signifi-

cant if the verdict had been murder, loses a great deal of its probative value and importance when the crime committed was one of sudden passion and anger. There is no evidence in this case, as there was in *Parker*, that a robbery or murder was intended by defendant. The gun and the keys to the stolen car were given by defendant to Ken Aubol hours before the heat-of-passion manslaughter was committed. There is no evidence that these items were given to Ken Aubol by defendant with the intent or plan that they would be used to commit a serious crime. The connection, then, between defendant's prior activity and the crime for which he was convicted seems tenuous and remote, if not wholly irrelevant under the facts of this case.

Moreover, although defendant was present at the scene of the crime, presence must be shown beyond a reasonable doubt to have intentionally aided or promoted the crime which was committed. Here, there is no such evidence.

Unlike *Parker*, there was no protracted presence or participation by any of the parties to this crime. In fact, the entire episode lasted only a few minutes. There is no evidence, except by possible speculation or inference, that defendant's actions on the scene in any way intentionally aided or promoted the crime which was committed. Even if this court could consider the inadmissible statement of Ken Aubol, through Detective Yagoda, that it was the defendant who helped move the body, this would at most tend to prove defendant's guilt to the crime of aiding an offender to avoid arrest under Minn.St. 609.495.

Furthermore, the eyewitness evidence presented by the state was fraught with inconsistencies and conflict. This is not to say that in order to convict a defendant the testimony against him must be consistent in all respects. However, there was a significant inconsistency about the number of shots the witnesses heard or when they heard them. There was also significant conflict in the testimony regarding the

number of people each witness observed at the gas station, the position of the people at the time of the shooting, or what they were doing throughout the course of the crime. In fact, there were no witnesses who could even identify defendant as being inside the building that night. All of this evidence, however, is critical to a conviction in this case.

Finally, substantially all of the physical evidence produced at trial tends to corroborate defendant's version of the facts. If defendant had been in the station building, had participated in the killing, and had helped move the body, it would seem that some glass or blood would have clung to his boots or clothing. Yet, none was found, though he was apprehended within minutes after leaving the scene.

After thoroughly examining the record, we find the evidence insufficient to sustain Gruber's conviction of aiding in the commission of the crime of manslaughter committed in the heat of passion. Consequently, defendant's conviction is reversed and the matter remanded to the district court with instructions to enter a judgment of acquittal.

Reversed and remanded.

WAHL, J., took no part in the consideration or decision of this case.