In the Matter of the WELFARE
OF M.D.S.

STATE of Minnesota, Respondent,

v.

M.D.S., Appellant.

No. C4–83–159.

Supreme Court of Minnesota.

Feb. 24, 1984.

Alan D. Margoles, St. Paul, for appellant.

Thomas L. Johnson, County Atty., Minneapolis, for respondent.

AMDAHL, Chief Justice.

This appeal is from a conviction of a female juvenile in Hennepin County District Court on a charge of aiding and advising felony murder in violation of Minn.Stat. §§ 609.195 and 609.19(2) (1982). The original petition by the State in July 1982 alleged aiding in the violation of Minn.Stat. § 609.195 (1982) (murder in the third degree). An amended petition on August 6, 1982, alleged aiding and advising, under Minn.Stat. § 609.05, criminal damage to property, under Minn.Stat. § 609.595, which caused the death of the victim in violation of Minn.Stat. § 609.19(2), second-degree felony murder. At the close of the State's case, defendant moved for acquittal. The motion was denied. On November 30, 1982, after a 4-day juvenile court proceeding, the presiding judge found the amended petition alleging murder in the second degree had been proven. At a dispositional hearing held on December 31, 1982, the juvenile was ordered committed to the Commissioner of Corrections at Sauk Centre. Defendant's motion to stay the execution of the commitment and place defendant in the St. Cloud Children's Home for psychiatric treatment was denied. Defendant's motion for amended findings pursuant to Rule 7.21 of the Hennepin County Juvenile Court Rules was also denied.

At the omnibus hearing held prior to trial, defendant moved for suppression of statements made by her companions against whom charges were pending. Judge Porter assumed the companions would assert their constitutional right to silence and refuse to testify. He found

that the statements were not given under oath, were crucial to the State's case-in-chief, and were made during the course of police questioning. The statements were ruled inadmissible, since the unavailability of the declarants for cross-examination would violate defendant's constitutional right of confrontation.

Defendant appeals the findings at the omnibus hearing that the statements of the police officers did not constitute an arrest, a promise of immunity, a threat, or coercion; that defendant was fully and adequately informed of her constitutional rights; that defendant made a knowing, intelligent, and voluntary waiver of her right to remain silent; and that defendant's own inculpatory statements were voluntary and admissible at trial.

In addition to the appeal on the above-stated fourth and fifth amendment issues we are presented with the following questions: whether the State presented sufficient evidence to prove that the juvenile defendant intentionally aided and advised in the intentional criminal damage to property which resulted in the victim's death, and whether defendant's own inculpatory statements were sufficiently corroborated by independent evidence, in accordance with Minn.Stat. § 634.03 (1982), that defendant committed a crime.

The defendant juvenile was 14 years of age on July 17, 1982, when she and two adults, James Croft and Ronald Back, allegedly participated in a shooting spree with a high-powered rifle. Four bullets were fired at the home of the victim. One of those bullets struck and killed her.

### A. *Events leading to the killing.*

Defendant apparently spent most of July 16 and 17, 1982, at the apartment shared by James Croft, Ronald Back, and Adam Andazola, men whom she had known for some time. The amount of alcohol and marijuana she had consumed that day and evening is in dispute. She claims that she and her companions, Croft and Back, were intoxicated. Sometime during the evening defendant, Back, and Croft went for a ride, with defendant sitting in the front seat between the two men. All three smoked marijuana as they rode. Croft drove to the home of an ex-roommate whom he had a grudge against and smashed his car twice into the back end of his ex-roommate's car, which was parked in the driveway.

The three drove away and later returned to the scene but left immediately because the police had arrived. At approximately 11:30 p.m. the trio returned to the apartment and apparently resumed drinking and smoking marijuana.

Defendant claims to have been so intoxicated at this point that her memory was very foggy, but actually she recalls a fair amount of detail. The three then decided that they would go shooting in a field. Either Croft or Back put the cased rifle, which defendant recalls was either a .44 or a .45, and two boxes of ammunition into the back of the car. Defendant claims that she doesn't know how to shoot a gun and has never shot, loaded, or carried bullets for a gun. No evidence was presented to controvert this assertion. The trio took another car on the drive this time. Defendant recalls it was a light brown Buick, with a black top, about a '73, four-door, that "was pretty beat up." Once again she was seated in the front seat between Croft and Back, with Croft driving. The men then switched places so that Croft could fire the weapon and Croft began shooting at street signs, houses, and cars.

In neither of her two statements did defendant assert that she tried to restrain this behavior in any way or that she was upset by it. At trial she stated that she "didn't say anything to him [Croft] because [she] didn't want to make him mad or get him upset." No other evidence was presented to show she was afraid of Croft, and at trial she said that he had never shown any violence before or given her any reason to fear him. She also testified that she did not try to stop Croft because "I was just there for the ride and I didn't want to get involved in what was going on and I couldn't stop Croft from doing anything like that anyways."

At one point, while driving in Brooklyn Center, Croft got angry at a driver who "passed him or something" and he sideswiped the other car. Defendant remembered in her second statement that it was a dark blue or black El Camino pickup, that the incident happened near the Super America store, and that Croft hit the other car once or twice. She recalled that "some of [the sideswiping] was on a highway and some of it was on a street" and further that "the car chased them for awhile and then we lost him."

Shortly before 1 a.m. on July 17, 1982, someone (defendant doesn't remember who) suggested shooting at the victim's son's home. She stated: "I don't think I said anything like that" but then she also said "[m]aybe I did say it, I don't remember." Croft asked defendant where the victim's son lived. At trial defendant professed to have blacked out at that point and to have no idea how Croft found the victim's home. In her second statement, however, defendant stated that "Jim said something about where does that * *. * kid live and then I told him and we went there." At the omnibus hearing she also admitted that she told them how to get there. All the evidence presented at trial indicated, as the State argues, that neither Croft nor Back had ever been to the victim's son's house or knew where he lived, whereas defendant had been there on a number of occasions.

■ The three drove to the home and Croft began shooting. In her first statement, defendant recalled that the car was moving when some of the shots were fired and was parked in the middle of the road "in the opposite way of the Dupont bridge" when the rest of the shots ("about 5") were fired. But at trial she claimed that she blacked out and was awakened by the sound of the gunshots. At that point, Croft was shooting at the door of the house and someone told Croft to shoot at the windows instead. Defendant, in her second statement, said, "some ... I think it was me, said shoot through the windows or something, not through the door." [1]

One of the shots mortally wounded the victim, a 32-year-old woman who had turned on the porch lights and had laid down to sleep on the porch in the front of her house to escape the heat. Neighbors witnessed an older model Buick idling outside the home. Then, three or four loud noises and flashes of light were heard and seen coming from the Buick.

The victim's husband heard shots or firecrackers and then a choking, gurgling sound. He ran to the living room and found his wife standing in the doorway between the porch and the living room, bleeding heavily from a bullet wound that had entered her back and exited through her shoulder. Glass fragments were found embedded in her back. The victim died of excessive blood loss shortly after being transported by ambulance to the hospital.

Investigators found three .44-caliber bullets at the scene and determined that at least four had struck the victim's home. The bullets were admitted into evidence. Ned Austin, the medical examiner, testified that it could not be determined to any degree of certainty which of the four shots fired was fatal. According to defendant's second statement, at one point during the shooting spree, the trio returned to the apartment for more bullets. After some drinking they left with the additional ammunition.

Defendant testified at trial that after the shooting she told Croft she wanted to go home, although in her first statement to police, she had said, "Well, I wanted to go home, but I didn't say anything to them guys about it." Croft insisted on shooting at one more place and defendant suggested

---

1. Defendant gave conflicting testimony with regard to this issue. In her first statement she had said: "Ron told [Croft] not to shoot at the door to shoot through the windows * * *." At trial she responded to cross examination thus: "A: Then I think somebody said, 'Don't shoot at the doors, shoot at the windows.' Q: Who said that? A: I don't remember." On appeal we view the evidence in the light most favorable to the prosecution. *State v. Wahlberg*, 296 N.W.2d 408 (Minn.1980).

the Earle Brown Elementary School. Defendant claims she suggested the school "because it was empty, no one was likely to be hurt, and it was nearby," and she was anxious to get home. One of the shots at the school hit the master clock, which stopped at 1:22 a.m. One more home was shot at on Lilac Drive. The three then returned to the apartment, and defendant claims that she was carried in, too drunk to walk, and that she got sick and passed out for the rest of the night. Defendant eventually went home. In the morning she learned that the victim had been killed.

According to the testimony of Adam Andazola, the roommate who did not participate in the shooting spree, defendant brought the newspaper clipping to their apartment and they discussed disposing of the vehicle and the rifle and fleeing the state. All four then hid the rifle at Back's parents' house. It was later found by police, was determined to be the weapon that fired the bullets found in the victim's home, and was admitted into evidence. The Buick was taken to Back's estranged wife's residence, where it was found by the police. Defendant returned to the apartment that evening, and the trio, along with Adam Andazola, attended a party together.

### B. *The investigation.*

Two police officers in plain clothes, New Hope Officer Jeffrey McFarlane and Brooklyn Center Police Sergeant John Ptak, went to the home of defendant and her mother on the afternoon of July 20, 1982. The substance of what was said by the officers is controverted. Officer McFarlane testified at the omnibus hearing that he told defendant she was a "material witness to a homicide." Defendant testified that Officer McFarlane told her "that they had reason to believe that I was involved with the murder, and that I was going to be taken down to the station and asked questions." Defendant claims she asked if she was being put under arrest and was told "no, not if I come on and cooperate." Her mother also testified that Officer McFarlane said, "No, if you come willingly and cooperate."

Officer McFarlane disputes this contention; "No, she did not ask me whether she was under arrest." The officer stated at the omnibus hearing that "the statement that was made by myself at that particular time was that based upon probable cause that we had that [defendant] was a material witness to a homicide and I said rather than arrest her, I asked [her and] her mother, 'Will you accompany us to the Brooklyn Center Police Station voluntarily?'" Appellant urges this court to take the "common sense interpretation of Officer McFarlane's language, omitting the court reporter's subjective grammatical marks which were not actually stated by the witness." If the words "rather than arrest her" were voiced to defendant, the import, it is argued, is that defendant had no choice.

Officer Ptak admitted he had no probable cause to arrest defendant and that if she had refused to go to the police station she would not have been arrested. He testified that he did not recall Officer McFarlane saying anything about arresting or not arresting defendant. In fact, Officer McFarlane could not have arrested defendant because as a New Hope officer he was out of his jurisdiction.

Defendant and her mother went to the Brooklyn Center Police Station. Defendant claims they were transported, but the record is devoid of information as to how they arrived at the station. They were interviewed for an hour and a half in Sergeant Ptak's office by Sergeant Ptak and Officer McFarlane. Defendant's mother was with her at all times, but the mother knew nothing about her daughter's involvement in the shooting spree. Defendant was read the *Miranda* warnings apparently "to be on the safe side in case the case developed to where she could have been a suspect at a later time." Sergeant Ptak stated, however, that "we do not give rights to every witness we take a statement from." Sergeant Ptak again informed defendant that they were going to question her and that it would be best if she told the truth. She gave her statement and then returned home.

The next day, June 21, 1982, Sergeant Ptak called defendant and asked her to sign the first statement. During that conversation, defendant indicated that she had lied in the first statement, mainly about her alcohol and drug consumption, and that she wished to correct the inconsistencies.

She and her mother returned to the police station. Defendant corrected and initialed the first statement, she was given the *Miranda* warnings, and she then gave a second statement which largely corresponded to the first but contained more detail about the trio's intoxication. It was defendant who first stated that she wished to correct inconsistencies in her earlier statement. Sergeant Ptak testified that defendant's general demeanor while giving the first statement was "rather reserved, quiet * * * overall impression I had * * * was cool," although "[t]here might have been a couple of times during the statement where she may have been on the verge of crying, but did not break down at any time." Her mother, however, says defendant "was scared and she was crying."

During the second interview, defendant was quiet and reserved, as was her mother. Just prior to the second statement, defendant's mother asked Sergeant Ptak if she should consult with an attorney. He responded that he was not in a position to answer that question.

Defendant signed each statement and left the police station. Neither she nor her mother signed a written waiver of her constitutional rights. After each *Miranda* warning defendant said she understood and was willing to talk. She was later arrested and charged with murder in the third degree, which was amended to murder in the second degree.

## C. *Alleged statutory violations.*

Defendant was convicted of aiding and advising a crime under Minn.Stat. § 609.05 (1982). Subdivision 1 provides that "[a] person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Under subdivision 2 that person is also liable for "any other crime committed in pursuance of the intended crime if reasonably foreseeable by him as a probable consequence of committing or attempting to commit the crime intended."

The crime that defendant has been convicted of is found at Minn.Stat. § 609.595, subd. 1 (1982), which reads:

Whoever intentionally causes damage to physical property of another without the latter's consent may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both, if:

(1) The damage to the property caused a reasonably foreseeable risk of bodily harm.

Since the property damage inflicted caused the death of the victim, defendant was found guilty of felony murder under Minn.Stat. § 609.19(2) (1982):

Whoever does either of the following is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years:

\* \* \* \* \* \*

(2) Causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence.

The 1981 amendment revised the felony murder section to apply to *all* offenses committed after May 20, 1981, except criminal sexual conduct. *See* Act of May 19, 1981, ch. 227, § 10, 1981 Minn.Laws 1010 (amending Minn.Stat. § 609.19 (1980)). Shortly before amendment we decided, in *State v. Nunn*, 297 N.W.2d 752 (Minn. 1980), that even under the old felony murder rule (Minn.Stat. § 609.195(2) (1980)), the purpose of the statute was to "isolate for special treatment those felonies that involve some special danger to human life." *Id.* at 753. Accordingly, the *Nunn* court held that a burglary of a dwelling "should not be deemed a purely property offense because * * * such an offense always car-

ries with it the possibility of violence and therefore some special risks to human life." *Id.* at 754. This rationale is even more compelling when the offense involves the shooting of a rifle into a dwelling place.

### D. *Was the juvenile defendant arrested?*

■ The State concedes that when Officer McFarlane and Sergeant Ptak first went to defendant's home they had no probable cause to arrest her. The State claims, however, that because she voluntarily accompanied the police officers to the station she was not "seized" in the fourth amendment sense. In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the case relied upon by the State, the Supreme Court upheld the search and seizure by federal agents of a female defendant who fit a drug profile. The agents had no probable cause, but the Court found that no arrest had occurred because at the moment when she was approached by the federal agents there was no objective reason for her to believe she was not free to leave. The Court, in acknowledging the "need for police questioning as a tool for effective law enforcement," found that a person is " 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553, 100 S.Ct. at 1877. The test developed by the *Mendenhall* court was an objective one; "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (footnote omitted). The court described some examples of circumstances that might indicate a seizure. They included: "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance * * * might be compelled." *Id.* at 554, 100 S.Ct. at 1877. The State contends that several factors support the conclusion that no seizure occurred. First, the police officers in this

case were dressed in plain clothes and displayed no weapons. Second, no mention of an arrest was made. Third, the officers did not consider defendant to be a suspect but a "material" witness to a homicide. And finally, the officers stated at trial that had defendant refused to talk with them they would not have arrested her. The latter two arguments are clearly without merit. In a footnote to *Mendenhall* the Supreme Court unequivocally stated that the subjective intention of the officers to detain or not to detain the defendant was irrelevant except insofar as it was conveyed to the defendant. *Id.* at 555, n. 6, 100 S.Ct. at 1877, n. 6. As in *Mendenhall*, defendant here was not told "she was free to decline to cooperate." *Id.* at 556, 100 S.Ct. at 1878. Even if she was, the *Mendenhall* court made it clear that "the voluntariness of her responses does not depend upon her having been so informed." *Id.* at 556, 100 S.Ct. at 1878 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

Whether or not a reasonable person would have believed there was no choice but to accompany the police officers largely depends upon the message conveyed by Officer McFarlane's words at the time. The trial court was able to judge the credibility of the witnesses and accepted the version of the facts as given by the police officers. We do not find this decision to have been clearly erroneous. It may be that a reasonable 14 year old would have been sufficiently impressed by the "show of authority" presented to believe she had no choice but to go to the station. Since the mother at that point had no idea what defendant's involvement in the crime had been and the police officers gave her no information, her presence when defendant agreed to go to the police station the first time is of little import. We need not decide this issue though because we find that she went to the station voluntarily the second time and the second statement was sufficiently attenuated from the first trip to the station to have been purged of the taint, if any, of the first trip.

E. *Were the juvenile defendant's two statements admissible?*

■ A statement obtained after an illegal arrest must be purged of the taint of any fourth amendment violation so as to represent a product of the detainee's free will. The United States Supreme Court, in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), applied as determinative the factors established in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975):[2] "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances * * * and, particularly, the purpose and flagrancy of the official misconduct * * *. And the burden of showing admissibility rests, of course, on the prosecution." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, *quoted in Dunaway*, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979). The *Dunaway* court excluded a confession because "in the less than two hours that had elapsed between the arrest and the confession there was no intervening event whatsoever." 442 U.S. at 219, 99 S.Ct. at 2260. Further, the *Dunaway* arrest was clearly an expedition for evidence.[3] The situation in our present case is very similar to the *Dunaway* case with regard to defendant's first statement.

■ The same evils are not attendant upon the second statement. Under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), defendant's release and subsequent return the next day were sufficiently independent to erase the taint of an illegal arrest if it occurred. Defendant's mother was by then well informed of the seriousness of her daughter's predicament and they were able to confer in private before returning to the station. Defendant's mother testified at the omnibus hearing that during part of the day and the evening before defendant returned to the station they discussed the seriousness of the incident and her mother's concern about it. Moreover, the police did not transport defendant to the station the second time. Her mother drove her there voluntarily. Defendant was by then aware that the police had statements from Croft and Back and her careful correction of the first statement shows the seriousness with which she viewed her situation. Defendant tries to analogize to *U.S. v. Johnson*, 626 F.2d 753 (9th Cir.1980), in which the court indicated that since Johnson had already committed himself in the first statement, there was little incentive to withhold a repetition of it and therefore the taint of the illegal arrest remained. This analogy is without merit because defendant's second statement was not a repetition but a correction of the first and it contained new information. These intervening events are sufficient to have rendered the second statement admissible even if an illegal arrest had been found to have occurred.

Having found the second statement to be admissible under the fourth amendment, we must reexamine the circumstances under which it was given to determine if any fifth amendment violations occurred. Did the juvenile defendant voluntarily, knowingly, and intelligently waive her constitutional rights to silence and to an attorney so as to allow her statements to be admissible at trial?

In the recent case of *Fare v. Michael*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the United States Supreme Court "assume[d] without deciding that the *Miranda* principles were fully applicable" to juvenile proceedings. *Id.* at 717, n. 4, 99 S.Ct. at 2567, n. 4. "The determination of whether statements obtained during custodial interrogation are admissible against the accused" mandates an inquiry

2. We adopted these and several of the other *Brown* factors in *State v. Weekes*, 312 Minn. 1, 9, 250 N.W.2d 590, 595 (1977).

3. The United States Supreme Court very recently affirmed the continuing validity of the *Brown-Dunaway* line of cases in *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), wherein a 6-hour period between the illegal arrest and the confession and a 5 to 10 minute visit by the defendant's girlfriend and a male companion were held to be insufficient attenuation.

into the "totality of the circumstances." *Id.* at 724, 725, 99 S.Ct. at 2571, 2572.[4]

▮▮▮ There are two distinct determinations to be made to decide if a valid waiver of *Miranda* rights has occurred: was the waiver voluntary and were the rights knowingly and intelligently waived? *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The burden of proof is on the State and is a heavy burden. *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam).

i. *Were the statements given voluntarily?*

In the landmark juvenile rights case of *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court admonished that "the greatest care must be taken to assure that the [minor's] admission was voluntary." *Id.* at 55, 87 S.Ct. at 1458.

▮▮▮ Defendant argues that her waiver was not voluntary because she was led to believe that if she cooperated with the police she would not be arrested. Defendant asserts that her return the second day was an act of "concerned cooperation" indicative of her belief that cooperation would avoid arrest. She claims that Officer McFarlane promised immunity and threatened arrest and that she was thereby improperly tricked into waiving her rights. The juvenile in *Fare* made a similar allegation "that the police made threats or promises during the interrogation to pressure him into cooperating in the hope of obtaining leniency for his cooperative attitude." 442 U.S. at 727, 99 S.Ct. at 2573. But the Court held this claim to be without merit because:

> The officers did not intimidate or threaten in any way. Their questioning was restrained and free from the abuses that

so concerned the Court in *Miranda*. The police did indeed indicate that a cooperative attitude would be to respondent's benefit, but their remarks in this regard were far from threatening or coercive.

*Id.* (citations omitted).

The identical circumstance is presented here. There is no evidence of even subtle psychological coercion by the officers. Indeed, in response to a question on direct examination at the omnibus hearing defendant said that she would have cooperated with the officers in the same manner even if she though she would be arrested.

The leading case in Minnesota with regard to this issue is *State v. Biron*, 266 Minn. 272, 123 N.W.2d 392 (1963). But the circumstances in *Biron* were extreme. The juvenile had been expressly told that he would have his case brought in juvenile court if he cooperated and that if he did not the officers would not even seek juvenile court proceedings. A case that is closer on its facts to this case is *State v. Merrill*, 274 N.W.2d 99 (Minn.1978), which framed the question as established in *Biron* to be "whether the detectives' statements to defendant amount to 'persuasive arguments calculated to induce a confession.' " *Id.* at 107. The detectives in *Merrill* made no implied or actual promises to the defendant, so even though he may have concluded that he would be charged with a lesser offense, these circumstances were insufficient to negate a valid waiver.

In the instant case, no implied or actual promises were made and none of the circumstances of the arrest rise to the level of sufficient coercion to negate a waiver of defendant's *Miranda* rights. There was no basis at all for her belief that she would gain immunity if she cooperated.

---

**4.** Rule 6.01 of the new Minnesota Rules of Juvenile Court Procedure, effective May 1, 1983, provides that "a confession, admission or other statement, given by a child who is in custody for a delinquent act * * * which is given as a result of an interrogation by a peace officer * * * is admissible in court * * * only after an advisory and waiver." The advisory under subdivision 1 includes all aspects of the traditional *Miranda* warning. The waiver of the right to remain silent and the right to an attorney under subdivision 2 must be *voluntarily* and *intelligently* given as determined by the totality of the circumstances which "includes but is not limited to the presence and competence of the child's parent(s) or guardian, the child's age, maturity, intelligence, education, experience and ability to comprehend."

ii. *Was there a knowing and intelligent waiver?*

 A totality of the circumstances test is also applied to ascertain if a child has knowingly and intelligently waived his or her rights. The factors to be considered are the child's age, maturity, intelligence, education, experience, ability to comprehend, and the presence and competence of his or her parents during waiver.

 The Minnesota case of *Matter of Welfare of S.W.T.*, 277 N.W.2d 507 (Minn. 1979), establishes the framework for this analysis. Two 12-year-old boys were accused of aiding and advising a felony murder. Both were read *Miranda* warnings with their mothers present and both indicated they understood. The waiver of one boy was held to be valid while the waiver of the other was held invalid because of psychiatric testimony that he was exceedingly emotionally disturbed, was functioning at the intellectual level of an 8 year old with an I.Q. in the mid-70's, and was incapable of understanding or intelligently waiving his fifth amendment rights. *Id.* at 513.

Defendant does not even approach this level of incompetency. Indeed her presentence psychological evaluation showed she was average or above average in intelligence. She has had a pattern of truancy from school, explained in part by bouts of illness with mononucleosis and strep throat. However, there is no indication that she is learning disabled or a slow learner. Her grades had been average, but in eighth grade she attained only a "D" average. Her grades at school were obviously a result of poor attendance and not lack of capacity.

According to psychiatric testimony defendant is excessively subject to the influence of other people but shows no clearcut evidence of psychiatric instability. While only 14 years old chronologically at the time of the event in question, she had experienced much more of life than the majority of persons her age. She had a history of alcoholism, drug abuse, and sexual relationships with adults, beginning at a very young age. At the age of 13 she and a friend had run away from home and hitchhiked across 10 states for a period of 2 weeks. She had lived on her own for 2 weeks and had associated socially with adults for at least 2 years.

Defendant was given the Miranda warnings before each statement and was asked if she understood after each sentence. She repeatedly indicated that she did understand. We conclude that defendant validly waived her fifth amendment rights.

F. *Aiding and advising in felony murder.*

 Defendant also contends that the State presented insufficient evidence to prove that she intentionally aided and advised in the intentional criminal damage to property which resulted in the victim's death. The case law on aiding and advising under Minn.Stat. § 609.05 is absolutely clear that an aider and adviser need not have pulled the trigger; "a person may be held criminally liable as an aider and abettor without actively participating in the overt act constituting the primary offense." *State v. Strimling*, 265 N.W.2d 423, 429 (Minn.1978).[5] *Strimling* cited the seminal case of *State v. Parker*, 282 Minn. 343, 164 N.W.2d 633 (1969), for the proposition that a person can aid by inaction. Presence, companionship, and conduct before and after the offense are circumstances from which the requisite criminal intent may be inferred. In *Parker* "his presence and acts helped to make all the crimes possible. Therefore, his lack of objection under the circumstances supports his con-

---

**5.** The word "abet" was not used as a part of Minn.Stat. § 609.05 when it was adopted in 1963 to supersede Minn.Stat. § 610.12 which abolished the common law distinction between principals and accessories. According to the Advisory Committee comments, "abetting" was believed to "add nothing to what is already provided," presumably because the dictionary defines "abetting" as a synonym for "aiding." Black's Law Dictionary 1190 (3d ed. 1969). "Aiding and advising" is more descriptive and is the correct phrase for the offense covered by this statute.

viction." 282 Minn. at 355, 164 N.W.2d at 641.

■ The more recent cases of *State v. Gruber*, 264 N.W.2d 812 (Minn.1978), and *State v. Ulvinen*, 313 N.W.2d 425 (Minn. 1981), refined but did not alter this standard. Both *Gruber* and *Ulvinen* found insufficient evidence for a conviction. But both stressed that a mechanical application of the *Parker* rule is to be avoided. The decisive factor in *Gruber* was that "evidence of prior activity, *which may have been significant if the verdict had been murder*, loses a great deal of its probative value and importance when the crime committed was one of *sudden passion and anger*." 264 N.W.2d at 819 (emphasis added). There was no evidence in *Gruber* that a robbery or murder was intended, no protracted presence by the defendant during the commission of the crime. Although the defendant had given the gun and the keys to a stolen car to the perpetrator there was no connection shown between this event and the subsequent heat-of-passion shooting. The contrast with this case is obvious. The evidence, viewed in the light most favorable to the prosecution, shows that defendant was present before, during, and after the shooting. This was not a heat-of-passion crime. There had been shooting at signposts and homes before the critical incident. The crime charged is the criminal destruction of property leading to the death of the victim. Thus, the intended damage to property in a dangerous manner is the requisite *mens rea*. The verdict was felony murder and evidence of prior activity is highly significant under *Gruber*. Defendant made no objection to this random shooting behavior. She even returned to the apartment with the men for more ammunition and then got back into the car for a continuation of the same activity. Her

allegation at trial that she feared Croft was not proven and in any case did not rise to the level of coercion or duress.

Moreover, the evidence is overwhelming that she directed Croft and Back to the victim's home.[6] This is just the type of prior aid which the *Gruber* court would regard as extremely significant evidence of the requisite criminal intent.

The *Ulvinen* case does not alter this reasoning in declaring that something more is required than "mere inaction" to impose liability under Minn.Stat. § 609.05. Directing the driver to the victim's home, riding along in the car without protesting the random rifle shooting, and aiding in the concealment of the weapon the following day do not constitute "mere inaction" or "passive acquiescence." There was no evidence in *Ulvinen* that the mother's statement to her son to the effect that the murder of her daughter-in-law "would be the best for the kids" had any influence on the son's decision to kill his wife. 313 N.W.2d at 428. However, defendant gave the victim's address to Croft and he then drove to the home obviously influenced by those directions. Additionally, she admitted telling Croft to shoot at the windows. Defendant's assertion that she had no power over Croft's actions is inconsistent with her claim that when she told him to shoot at the windows he did so and when she directed him to the Earle Brown School he went there. Taken together all these actions are sufficient evidence to support the inference that defendant intended criminal damage to the victim's home.

■ Defendant's claimed intoxication is not sufficient to negate this level of intent. She contradicted herself so often that it is impossible to determine how much was ingested.[7] The rule in Minnesota is

---

6. Defendant had been involved with the victim's son who had allegedly, on one occasion, physically abused her. Croft and Back had no prior connection with the victim aside from their knowledge of defendant's relationship with the victim's son. That relationship at the time of the offense has been described as a "friendship."

7. In her first statement to the police on July 20, 1982, she denied having consumed alcohol or having used illegal substances of any type and denied that her companions were drunk. She subsequently corrected this statement by crossing it out, and in her second statement, given the next day, she claimed she had consumed 6 mixed drinks of Black Velvet and 7-Up and

that "the mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is incapable of intending to commit a certain act." *State v. Wahlberg*, 296 N.W.2d 408, 418 (Minn.1980). The defendant has the burden of establishing intoxication by a fair preponderance of the evidence. In view of the minute detail defendant recalls about the evening of July 16, 1982, and the selectivity of her memory, we hold defendant has not met that burden. It strains credibility to believe she blacked out at the precise moment Croft decided to fire the first shots and she awoke with the firing of the last two which, according to defendant, must have been the fatal shots. It is hard to believe that immediately upon returning to consciousness she had the presence of mind to think about whether shooting through windows is safer than shooting through walls, which is the rationale she advanced at trial. Additionally, she testified that the car was at one point parked in the middle of the street in front of the victim's home and at another point was moving while Croft was firing. This testimony is inconsistent with the claimed lack of consciousness. Further, there was no mention of blackouts even in her second statement which was meant to clarify the first, specifically with regard to the subject of intoxication. The State has proven beyond a reasonable doubt that defendant aided and advised in a felony murder.

### G. *Corroboration*

█ Defendant's final argument is that the State produced insufficient independent evidence to corroborate her own inculpatory statement. Under Minn.Stat. § 634.03, a confession of the defendant shall not be sufficient to warrant a conviction without evidence that the offense charged has been committed. The section has a dual function. It discourages coercively acquired confessions and makes the admission reliable. *State v. Azzone*, 271 Minn. 166, 135 N.W.2d 488 (1965).

Defendant makes the argument that each element of the offense of aiding and advising a felony murder must be independently corroborated to meet the Minn.Stat. § 634.03 (1982) standard. But the trial judge was correct in asserting that this is not a correct statement of the law.

Although the United States Supreme Court has not specified exactly what is sufficient corroboration of a confession to make it admissible, it has held, in *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), that the prosecution's task is to bolster the confession by independent evidence of trustworthiness. *Id.* at 156, 75 S.Ct. at 199. In *Smoot v. United States*, 312 F.2d 881 (D.C.Cir.1962), the crime was also aiding and advising. Because there was no tangible injury which could be isolated as the *corpus delicti* of the crime, the accused had to be identified in order to show a crime had been committed.

Nonetheless, not all or any of the elements had to be individually corroborated but could be "sufficiently substantiated by independent evidence of attending facts or circumstances from which the jury may infer the trustworthiness of the confession." *Smoot*, 312 F.2d at 885. *Accord Opper v. United States*, 348 U.S. 84, 92–93, 75 S.Ct. 158, 164–165, 99 L.Ed. 101 (1954).

█ Application of these rules to the case at issue reveals that the State did produce enough evidence to identify defendant and to bolster and substantiate her own admissions. Adam Andazola's testimony that defendant brought the newspa-

---

smoked 4 joints of marijuana prior to taking a drive the evening of July 16, 1982. Aside from mentioning that on that evening they all returned to the apartment and "had a couple more drinks," there were no further questions asked or statements made about intoxication at that time. At trial, however, defendant claimed to have consumed 8 alcoholic drinks, smoked 6

joints of marijuana, and smoked 3–5 bowls of marijuana in a bong *before noon* on July 16, 1982. She went home for an hour or so that afternoon and then returned to the apartment. After 6 p.m. that evening she claims to have smoked another 4 or 5 joints and then consumed 7–9 alcoholic drinks at the Earle Brown Bowl.

per clipping to his apartment the next day and discussed hiding the weapon and leaving town, while certainly not evidence in its own right of aiding and advising, is powerful support for the reliability of defendant's own statements. In testimony, a neighbor of the victim described a car just like the one defendant described. Testimony by the victim's son and her husband that neither Croft nor Back had ever been to their home but defendant had been there often supports defendant's admission in the second statement that she gave Croft the address. In addition her direction to Croft to shoot at the windows is directly supported by evidence of glass fragments having been found in the victim's back. Her admission that she directed Croft to the Earle Brown School is buttressed by evidence of property damage at the school, further lending credibility to all of her statements. Evidence that the bullets fired into the victim's home were from a .44-caliber rifle and that a .44-caliber rifle was found at Back's parents' home comports with defendant's description of the weapon. It is evident that the State has met its burden of producing corroborating evidence. The evidence shows beyond a reasonable doubt that defendant's conviction for aiding and advising in a felony murder should be upheld.

Affirmed.