## STATE v. JOHN WILLIAM PARKER.

164 N. W. (2d) 633.

January 31, 1969—No. 41000.

344

*C. Paul Jones,* State Public Defender, and *Frederick S. Richards,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

*Robert A. Nicklaus,* amicus curiae.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Rogosheske, JJ.

NELSON, JUSTICE.

Defendant, John William Parker, appeals to this court from a judgment of conviction of aggravated robbery. On January 10, 1967, he was sentenced to the Youth Conservation Commission for an indeterminate term or until thence discharged by due course of law or by competent authority.

On August 9, 1966, a complaint was filed in Hennepin County Municipal Court charging defendant and his accomplices, Calvin Earl Sam and Paul Peter Roy, with the commission of the crime on August 6, 1966, pursuant to Minn. St. 609.245 and 609.05. Defendant waived preliminary hearing and was bound over to Hennepin County District Court September 8, 1966. An information charging him with the crime was prepared and he was arraigned and entered a plea of not guilty to the charge of aggravated robbery on September 9. He was given a

Rasmussen hearing (State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. [2d] 3) on November 21, 1966.

The victim, Larry Leventhal, was a 25-year-old senior at the University of Minnesota Law School who spent the summer of 1966 working on a research project at the University and did further research at the Legal Aid Center in downtown Minneapolis. He testified that after taking his date home on the evening of August 5 he parked one block away from Seven Corners, an area in close proximity to University of Minnesota properties, about 11 p. m. He visited three establishments frequented by college people where he watched an all-star football game and talked to students but did not have anything to drink. At the third establishment Larry "danced a couple times" and then left for his automobile "just after 1:00."

While walking back to his car, Larry encountered a couple waiting on the corner for the light to change. The woman was an Indian, apparently in her twenties. The man was white and appeared to be a bit older. Larry talked with the couple for a minute or two. Since they did not have a ride, he offered them one. The couple asked Larry to come into their residence, but he first told them he would rather not because he wanted to get home. They insisted and he went in with them.

In the couple's apartment, Larry met the woman's sister and one of the two codefendants, Calvin Earl Sam. Larry had drunk not quite a half glass of beer when Sam stated that he wanted to get some hamburgers and asked Larry for a ride to the Band Box on Franklin Avenue. Larry agreed, but upon arrival there they found the restaurant closed. They turned around, heading back in the direction of the residence where he had met Sam. Larry expected to let him off and go on to his own home.

Three or four blocks away from the Band Box defendant was standing near the Franklin Theatre with a girl. Sam stated that he knew the man and Larry stopped the car. Sam, while seated in the automobile, talked to defendant for a few minutes, introducing Larry to defendant and the girl. Defendant said he knew of a party he would like to attend and asked Larry if he wanted to go to the party, Larry answering that he did not. Then he was asked if he would give them a ride to it and he agreed to do this. Defendant then got into the car.

Sam stated he wanted to pick up some beer before going to the party. They went to his apartment in the Seven Corners area and he went in and brought back a carton of beer, placing it in the back seat of Larry's convertible. Sam and defendant then directed Larry to the place where the party was supposed to be in progress. While en route defendant exclaimed, "There's my brother. Why don't you stop so I can talk to him." The brother was defendant's second codefendant, Paul Peter Roy. He came over to the automobile and talked. Defendant then asked Larry to give Roy a ride to the party. Roy got into the back seat and sat on the right side. Defendant and Sam were in the front seat. Roy also stated that he wanted some beer for the party and directed Larry to an address several blocks away, where he got out and returned to the automobile carrying a sack. Larry told them he was anxious to get home.

The three passengers then gave Larry what he assumed were directions to the party. He said they told him, "Take a left here, a right here," and "they kept leading me about for about maybe ten minutes or so. And I was getting quite frustrated." Upon passing a certain place, the passengers said, "This is it, but no one is here now. We'll have to come back in a few minutes." Larry asked them to get out of the car, saying that he wished to leave. They said they had no place to go, but if they came back in five minutes they could go right in. Larry began driving again, but said that if no one was there in five minutes they would have to leave anyway.

He drove them about for a short time and then returned to the location of the party. He then stopped the car, informed them that they were there, and that he was going to have to go. The trio did not say anything. None of them moved to leave Larry's car. Suddenly, defendant grabbed Larry's arm and with his other hand grabbed for the keys to the car. Almost instantly the three of them piled onto Larry, holding him down while defendant wrestled the keys from his hand. All three of them were then hitting him at various points while Larry struggled to get away. He was struck over his body and pushed into the back seat by defendant and Sam. The accomplice, Roy, then proceeded to hold Larry in a "hammerlock," grabbing his wallet. Meanwhile, defendant assumed control of

the car and took off, driving rapidly. In addition to Larry's billfold, which contained $30 to $35, his watch was also taken.

After a while Sam said, "Let me drive," and defendant shifted positions with him without stopping the car. Larry was being "hit quite continually" and Roy had pulled out a beer can opener, held it tightly against Larry's throat, and was choking him with his hands. Larry pleaded with his assailants, but they responded with a number of blows. In an effort to escape, Larry told them that he had an apartment (which was untrue) and that he had about $500 in it which they could have. He tried a similar tactic later, saying he knew of a factory in north Minneapolis that had quite a bit of money on hand that he could get into. Apparently the trio did not believe him or did not think it was worth the risk.

Meanwhile, Roy kept saying things like, "You know you are going to die, don't you? " or "This is going to be curtains for you. I killed three guys and you are going to be the fourth." Defendant said several times, "Shoot him now," and "Let's get rid of him right now." Defendant and his two cohorts continued to beat up on Larry. After hitting and kicking him, they grabbed one of the full beer bottles and "cracked" him over the head. The bottle broke, shattering glass everywhere. Larry recalled being struck on the head at least three times. He finally concluded that his only chance might be to fake unconsciousness, but when he did so he was hit a number of times after he had gone limp. The blows were continuous and merciless.

Larry testified that the trio eventually said:

"* * * 'Well, he's out.' One of them said, 'Nobody could take that much and be conscious.' Roy continued holding me. He wasn't choking me any more or trying to hold me tightly. I was leaned up against him, and he had his hand placed down on my chest. The two in the front, Sam and Parker, were talking about trying to find some rope or something of this variety so they could possibly tie me up. The three of them in talking, their intention was to tie me up, stick me into a trunk, and then drive up—drive out in the country with me in the trunk and then go out when they were in the country to dispose of me. That was the word they used, whatever they meant."

Finally, by feigning unconsciousness, Larry caused Roy to relax his grip and when the automobile came to a halt in Columbia Heights, in what seemed to be a fairly desolate area, Larry said, he suddenly "flipped around my right arm quite quickly and jammed it into [Roy's] face, just slammed it and gouged it into his face." With the same motion Larry propelled himself out of the window, feet first, and started running "for all I was worth." Somehow he had caught them off guard. They chased him but he continued to run as fast as he could, feeling that he was "probably running for his life."

The trio stopped the chase and got into Larry's convertible. He kept running for several blocks until he reached a busy street where he sought help from passing motorists. One of them responded by pointing out a store a block and a half ahead where a police car was parked. Larry ran to the police car and related to the officer, Sergeant Floyd Bixler, what had occurred. The officer obtained the license number of Larry's car by radio and broadcast information about the stolen car. Larry received first aid at the Columbia Heights police station and was then taken to Hennepin County General Hospital. After treatment there he was released, but later that day was again hospitalized for 5 days at Mount Sinai Hospital. Various pictures taken by the police, depicting his wounds, were received in evidence at the trial.

Before entering Mount Sinai Hospital Larry attended a lineup at the Minneapolis Police Department, where he identified defendant, Sam, and Roy as his assailants. Two days after the robbery Larry and his father went to the Minneapolis Police Department garage where they obtained Larry's convertible. In the back seat they observed blood stains on the seat. Broken glass from the beer bottles was still on the floor and on the back seat itself. Larry also found two beer can openers in the automobile. These items were received in evidence at the trial. Larry's billfold, which he identified as the one taken from him by defendant and his cohorts, was also received in evidence.

Patrolmen Joseph J. Remily and Douglas E. Olson of the Minneapolis Police Department were in a squad car patrolling the Franklin Avenue area early in the morning of August 6, 1966. At approximately 4:45 a. m. while going west on Franklin between 11th and 10th Streets they ob-

served a Chevrolet convertible facing east on Franklin between 10th and 11th Streets in front of the Band Box. The officers recalled that the police radio had reported an assault and robbery in the Columbia Heights area and that a car was taken, a " '66 Chevrolet convertible, black over blue," the occupants of which were suspected of being three Indian men.

When the officers saw the automobile it was occupied by three men. Two women were entering the vehicle. The driver of the patrol car turned on the red light, made a U-turn, and "hit the siren." As the squad car made the turn, the pursued vehicle sped away. It was chased for 3½ blocks before it was stopped. As the car came to a halt, its occupants tried to scramble out of it. The three men began running down the street. Remily gave chase on foot and after a 15- or 20-yard chase the three fleeing men heeded the order to stop. Remily told them they were under arrest. The three persons arrested ultimately were identified as defendant and his accomplices. Officer Olson intercepted the female passengers and released them after determining their identities to be Audrey Prentice and Silvia Martin.

A search by the officers of the automobile revealed Larry's billfold underneath the front seat on the floor of the passenger side. On the dashboard there was a plastic case containing Larry's driver's license and other identification. A quantity of beer and wine was also recovered from the vehicle, the major part of which was in the back seat. Officer Remily explained that he found numerous bottles and broken glass on the seat and in the rear of the car. He also stated that there was a "fresh stain" on the rear seat. He explained, however, that he did not investigate the broken glass further because at that time he had no reason to and thus paid no particular attention to it. He could not recall whether any of the three men arrested had on a watch.

Officer Olson said that the spot on the back seat was blood "as certain as I can be without seeing the blood fall there." A shirt taken from the person of defendant at the time he was booked contained a stain on the left arm and "a splattering at the bottom of the left cuff, and there was some on the right back." Officer Olson identified these spots as blood. A bloodstained shirt was also taken at the same time from the accomplice Sam, as well as $32.52 in cash.

Detective Michael Hlady of the Minneapolis Police Department interviewed defendant on August 8, 1966. After a full Miranda warning, defendant stated he understood his rights and consented to discuss the case. Detective Hlady informed defendant that they were investigating an assault and robbery that had occurred August 6, 1966, and that defendant was suspected of being involved with two other men. Defendant said that he had been picked up by Larry and Sam, "then they drove around some more, and they spotted another party, and they picked him up," and the four of them drove up to the Franklin Avenue area. Defendant named this fourth party as his half brother, Paul Peter Roy. Defendant stated that the four of them stopped at the scene of a homicide and "looked about."

"* * * And then they got back in the car. And then they drove on a little further. And the driver at that time was Larry Leventhal. And they stopped. And when they made this last stop he [defendant] told me that Calvin Sam took and dragged Larry Leventhal in the back of the car and handed him the keys. And John Parker said he drove the car for several blocks, and Calvin Sam said he wanted to drive. So Calvin Sam took over the wheel, and John Parker rode on the passenger side of the car in the front. And they drove out to Columbia Heights. And he said while they were driving out there this third party in the back seat with the victim was administering a beating to him [Leventhal]. He said it sounded awful. And when they got out to Columbia Heights he said Larry was just a bloody mess. And during this assault on the victim he was told—John told me that the victim never lost consciousness. And when he stopped in Columbia Heights, that Larry leaped through the window and fled. And they returned to the Franklin area in Minneapolis, and shortly thereafter they were picked up by the police."

Defendant, however, denied that he took any part in the assault or that he had taken any of Larry's property.

After relating the foregoing, defendant claimed he did not know who the "third party" was and said that they had picked up Roy at the Band Box just shortly before the police stopped him. When defendant stated

that he did not wish to give a formal statement, the interview was terminated.

Audrey Prentice stated that at approximately 4:45 a. m. August 6, 1966, she and her cousin, Silvia Martin, accepted a ride from defendant and his two accomplices. She did not think that the police car turned on its siren until after the convertible had proceeded about 1½ blocks. Silvia Martin testified that the police car turned on its siren and gave chase immediately after she entered the convertible. When asked whether there were items in the back seat of the automobile, she stated, "I don't know. I don't remember." She did not recall observing defendant's clothing, his face, or his hands.

Defendant took the stand in his own behalf. His testimony is, in the main, in conflict with the testimony produced by the state as to how he happened to meet the victim and as to how defendant and his two cohorts, one of whom he claimed to have seen only once before, got together. He testified that he was talking to his cousin, Jean Lagard, in front of the Sparkle Cafe on Franklin Avenue when Larry and Sam came there. Sam introduced Larry to defendant and Jean. Larry and Sam asked them if they wanted to go to a party. Jean declined, but defendant reluctantly agreed to go. He got into the back seat of Larry's car and they went to Seven Corners, where Sam got some beer and liquor. They returned to the Sparkle Cafe and near there met "another Indian guy." Defendant said the stranger asked to go along, Larry agreed, and defendant and "the other guy, we got in the back seat. Sam and Leventhal [Larry] was in the front. Leventhal was driving." The foursome "started riding around just looking for, you know, girls, Jean Lagard or somebody, and a party." The "unknown Indian" claimed he, too, wanted to pick up some beer and "we went to his house and got them [two six-packs], too." A little later, defendant stated, Larry and the "unknown Indian" started fighting in the back seat; "[t]he other guy was hitting Leventhal"; "[i]t just kept going on, and he kept beating him." In response to questioning by his privately retained counsel, defendant gave the following answers:

"Q. Was your attention called to the back seat thereafter?
"A. Yes.

"Q. What happened then?

"A. I seen Leventhal going out of the back window.

"Q. What were you doing as far as the driving at that time?

"A. We was going about 30, 40 miles an hour then.

"Q. Sam was driving?

"A. Yes.

"Q. And what, if anything, did you do?

"A. I looked back and I seen him going out of the window, his feet first.

"Q. And then what happened?

"A. I grabbed him and pulled him back in the car.

"Q. And why did you pull him back in?

"A. I think he would have killed himself if he had jumped out."

Defendant said that they kept on driving and reached Columbia Heights, where Larry then told them to stop the car. Defendant claimed that they drove to the end of a dead-end street and Sam turned the car around and stopped; that Sam, defendant, and the other Indian got out of the car; and that thereupon Larry crawled out of the door and started running while the three Indians "all just stood there and looked." Then the three of them got back into the car. He said Sam drove back to the Franklin Avenue area and they let the "unknown Indian" off on their way; that they went to the Band Box and found Roy there; and that they were about to give him a ride home when the squad car appeared and the officers pursued and arrested them.

Defendant conceded in his testimony that Larry, when he left the car, was full of blood and that he was "beat up." Defendant, however, denied that he assisted in the beating and said that he had told Sam to "knock it off." He said that he "knew the guy [Larry] had run to the cops—run to the police and say he had been beaten anyway. I didn't think he would say he had been robbed."

Defendant's first cousin, Jean Lagard, stated that "between 1:30 and 2:00" on the morning of August 6, 1966, she was in front of the Sparkle Cafe talking to defendant when Sam, who introduced himself as Calvin, came across the street and introduced them to Larry. She claimed that "Larry jumped out of the car and came around and grabbed my arm and

asked if I wanted to go to a party. And I said, 'No.' And then he asked me again if I wanted to go for a ride. And I said, 'No.' " The witness claimed that she left and went home as soon as her cousin, defendant, left with Sam and Larry.

On cross-examination, Miss Lagard conceded that defendant's nickname was "Bim," which she had testified was used by Sam in introducing defendant to Larry, and that it was a name by which defendant was known to his friends. She still insisted, however, that it did not "appear" that defendant and Sam knew each other. On further cross-examination she conceded that defendant and Sam did talk about mutual friends and finally admitted that she "imagined" it did appear to her that they knew each other.

The defense presented testimony of Arthur Cartrette, parole and probation agent with the Department of Corrections. He testified that defendant's accomplice, Roy, had been assigned to his supervision. The parole agent related that Roy had been convicted in North Carolina of assault with a deadly weapon with intent to kill, had been sentenced to 30 years' imprisonment, and had served 10 years and was on parole for the remaining 20 years of the term.

After the trial the jury returned for instructions, asking clarification on the point of "aiding and abetting." The foreman explained:

"* * * There is a little confusion as to how far—how much a person has to do to say that he is aiding, even at the point of can a person aid by inaction, by not leaving, if it's quite apparent to him that there is trouble * * *. Can he aid by his, say, just by his inaction at that point * * *."

The court then said:

"The Court can do nothing but read you the law on aiding and abetting. Is that the only point that is troubling you? * * *

* * * * *

"* * * The Court then, with the permission of counsel, will reread to the jury that portion of the instructions covering aiding and abetting. And after the Court has done so, that is as far as the Court can go in assisting you with your deliberations.

* * * * *

"* * * 609.05 of the Statutes reads as follows: 'A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime. The guilt of a defendant may be established without proof that the accused personally did every act constituting the offense charged. Whoever commits an offense or wilfully aids, abets, counsels, commands, induces or procures its commission is punishable as a principal. Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense is punishable as a principal. Every person who thus wilfully participates in the commission of a crime may be found to be guilty of that offense. Participation is wilful if done voluntarily and purposely and with specific intent to do some act the law forbids or with specific intent to fail to do some act the law requires to be done. That is to say, with evil motive or bad purpose either to disobey or disregard the law.'

\* \* \* \* \*

"You may now resume your deliberations, ladies and gentlemen."

Mr. Nicklaus, counsel for defendant, then stated:

"* * * Your Honor, in the light of what has happened here, could I see you with Mr. Winick [counsel for the state] in chambers?

"THE COURT: Yes. If you will wait just a moment then, ladies and gentlemen."

In the court's chambers Mr. Nicklaus stated:

"* * * May the record show that following the instructions, counsel and the Court adjourned to chambers and at this time I am asking the Court for an additional instruction to the effect and somewhat in these words, that on the other hand that if they find that the defendant did not aid, abet, counsel—and here the words of the Statute can be used—then there is no moral obligation on the part of the defendant to come to the aid of any party who has been the victim of a crime after the crime has been committed, and the accused did not participate in that crime directly, as instructed by the Court, or by participating in the manner of aiding, abetting, procuring, counseling, et cetera.

"MR. WINICK: State would oppose the motion and feels that the in-

struction speaks in the negative as well as the positive since it says you have to find this. * * *

"THE COURT: Motion will be denied."

Defendant now contends that the foreman's question shows that the jury rejected Larry's testimony that defendant directly participated in the assault and robbery. He contends that the trial court in effect instructed the jury that defendant might in fact have owed a legal obligation to render aid to the victim. Defendant contends that he did not have such an obligation and that the failure to discharge a moral obligation to aid Larry is not enough to convict defendant of the crime charged.

■ We think it clear that the foreman's remarks fail to prove rejection by the jury of the victim's testimony about defendant's participation in the assault and robbery. The verdict indicates that the jurors resolved whatever questions they initially had. However, the question whether a person can aid by inaction may well be answered in the affirmative since inaction is often the distinguishing characteristic of the aider and abettor and is encompassed within the statute. In this regard the "lookout" is a classic example. The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding or abetting, and it has been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. See, People v. Moore, 120 Cal. App. (2d) 303, 306, 260 P. (2d) 1011, 1013.

In the instant case defendant was present during the criminal activity. He did nothing to prevent the offenses committed or the brutal beating which the victim endured. He must have known of the robbery and made no effort to stop it, and we think, under the circumstances, his presence and acts helped to make all the crimes possible. Therefore, his lack of objection under the circumstances supports his conviction. See, People v. Villa, 156 Cal. App. (2d) 128, 136, 318 P. (2d) 828, 834.

■ It has been established that a person may aid or abet without actively participating in the overt act. If the proof shows that a person is present at the commission of a crime without disapproving or opposing

it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he assented to the commission of the crime, lent to it his approval, and was thereby aiding and abetting its commission. Certainly mere presence on the part of each would be enough if it is intended to and does aid the primary actors. See, Long v. United States, 124 App. D. C. 14, 20, 360 F. (2d) 829, 835.

This court is in accord with this principle. See, State v. Winkels, 204 Minn. 466, 283 N. W. 763; State v. Bellecourt, 277 Minn. 163, 152 N. W. (2d) 61. In the Bellecourt case we said (277 Minn. 165, 152 N. W. [2d] 63):

"* * * We have simply a claim by defendant that even if a crime was committed he cannot be convicted because it is not proved beyond a reasonable doubt that *he*—of the three persons present together at that time and place—struck the blow or took the money. Once a reasonable inference arises, however, from all the circumstances that defendant was a participant with two others in the commission of the crime of theft at that time and place, defendant's guilt is sufficiently established. This inference is a fact question for jury determination, and the jury found, as it could, that he was such a participant."

■ Evidence of subsequent acts is competent to prove participation in the criminal acts charged. See, People v. Bracken, 68 Ill. App. (2d) 466, 472, 216 N. E. (2d) 176, 179. Accord, People v. Cole, 30 Ill. (2d) 375, 196 N. E. (2d) 691; People v. Richardson, 32 Ill. (2d) 472, 477, 207 N. E. (2d) 478, 481; People v. Johnson, 35 Ill. (2d) 624, 626, 221 N. E. (2d) 662, 663. The testimony of defendant and other witnesses appearing in his behalf was definitely weakened by the circumstances of the flight of the defendant and his accomplices which took place when police authority appeared. See, People v. Clark, 30 Ill. (2d) 67, 72, 195 N. E. (2d) 157, 160.

We conclude that defendant's close association with the other men who appeared in the stolen car in front of the Band Box on the early morning of August 6, 1966, both before and after the crimes charged were committed, and the fact that the three of them were apprehended

fleeing from the convertible stolen from the victim, all tend reasonably to justify the conclusion that defendant joined with the other two cohorts in the common purpose of assaulting the victim, robbing him, and stealing his automobile. See, People v. Washington, 26 Ill. (2d) 207, 209, 186 N. E. (2d) 259, 261; State v. Smith, 32 N. J. 501, 521, 161 A. (2d) 520, 530.

■ Defendant on this appeal for the first time asserts that the trial court erred in its supplemental instructions by stating:

"* * * Participation is wilful if done voluntarily and purposely and with specific intent to do some act the law forbids or *with specific intent to fail to do some act the law requires to be done.*" (Italics supplied.)

Defendant now argues:

"Herein lies the error, for the trial court not only did not distinguish between moral and legal obligations, but it instructed the jury that the Appellant may, in fact, owe a legal obligation to render aid and assistance to Mr. Leventhal in his peril."

In its original instructions the court said:

"* * * Specific intent as the term itself suggests requires more than a mere general intent to engage in certain conduct. A person who knowingly does an act which the law forbids or knowingly fails to do an act which the law requires, intending with bad purpose either to disobey or disregard the law, may be found to act with a specific intent.* * * [W]hat the defendant does or fails to do may indicate intent or lack of intent to commit the offense charged."

Both the original and the supplementary charge in this case repeatedly used words connoting active participation as a prerequisite to a finding of guilt. The supplementary instruction must therefore be examined in the light of the original instruction to the jury on all the material issues in the case. See, Rauk v. Vold, 268 Minn. 56, 62, 127 N. W. (2d) 687, 692. It is apparent when so viewed that both sets of instructions were reasonably favorable to the defendant as well as to the state. The soundness of those instructions must have been evident to defendant's counsel, since at the close of the charge he expressed satisfaction with them as

originally given. Furthermore, after the supplementary instructions were given, defense counsel did not then voice any criticism of what the trial court had originally said in its instructions but only asked for an additional instruction. Nor did he claim error in the instructions in his post-trial motion for judgment of acquittal notwithstanding the verdict or a new trial.

The trial court's reference to "with specific intent to do some act the law forbids or with specific intent to fail to do some act the law requires to be done" constituted one reference in a comprehensive and proper statement of the law. It is elementary that the court's charge must be read as a whole. See, United States v. Baratta (2 Cir.) 397 F. (2d) 215, 227; Tillery v. United States (5 Cir.) 396 F. (2d) 790, 792; State v. Smith, 264 Minn. 307, 323, 119 N. W. (2d) 838, 849; State v. Billington, 241 Minn. 418, 63 N. W. (2d) 387; State v. Weber, 272 Minn. 243, 255, 137 N. W. (2d) 527, 535.

Although we have considered defendant's claims with respect to the instructions given, it is well settled that when a charge as a whole is substantially correct but in some particulars is verbally inaccurate or contains obviously unintentional misstatements, which it is fair to assume the court would have corrected had the matter been called to its attention, it is the duty of counsel to bring the matter to the attention of the court; and if he fails to do so, he waives the right to later object, either on a motion for a new trial or on appeal. See, State v. Billington, 241 Minn. 418, 427, 63 N. W. (2d) 387, 392.

Therefore, a party may not assign error because of omissions in instructions which do not go to fundamental law unless before the jury retires he has directed the court's attention thereto and stated distinctly the basis of his objections. State v. Brady, 244 Minn. 455, 463, 70 N. W. (2d) 449, 454.

In a recent Federal case, Wangrow v. United States (8 Cir.) 399 F. (2d) 106, the court refused to consider the alleged error relating to an instruction where at trial objection was on a different theory than that asserted on appeal, stating (399 F. [2d] 118):

"The only objection to the instruction at trial was that it tended to

shift the burden of proof to the appellants. The appellants thus failed to preserve the objection they now raise."

■ Defendant contends that he was denied due process of law because the lineup at which the victim was asked to identify his assailants at the time was comprised of six people, three Indians and three whites. Undeniably, Larry knew his assailants were Indians; but, when asked at the trial whether he was positive that the three he picked out were the ones who assaulted and robbed him, he unequivocally said they were. He had observed his three assailants for a considerable length of time, several hours, prior to the assault and robbery. It is clear, in view of the fact that the victim had ample opportunity to observe defendant prior to and during the commission of the crime, that his identification was not a product of the lineup. Under circumstances where a victim had ample opportunity to observe the defendant prior to and during the commission of the crime, People v. Brown, 20 N. Y. (2d) 238, 244, 282 N. Y. S. (2d) 497, 502, 299 N. E. (2d) 192, 195, the New York Court of Appeals refused to find prejudice.

Furthermore, defendant was not required to speak or perform any particular acts, nor was any accusatorial atmosphere directed in any particular manner against him at the time of viewing the lineup. See, State v. Garrity, 277 Minn. 111, 151 N. W. (2d) 773.

Defendant points out that he did not have counsel at the time of the lineup, citing United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. ed. (2d) 1149, and Stovall v. Denno, 388 U. S. 293, 87 S. Ct. 1967, 18 L. ed. (2d) 1199. However, these cases were not decided until June 12, 1967, — approximately 10 months after the commission of the crime of aggravated robbery involved herein—and were given prospective application only. We conclude that defendant has not established prejudice based on the lineup procedures and that the verdict of guilty is amply sustained by the evidence.

Affirmed.