**STATE of Minnesota, Respondent,**

v.

**Shane PIERSON, Appellant.**

No. C5–94–1333.

Supreme Court of Minnesota.

May 5, 1995.

John M. Stuart, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., and Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

KEITH, Chief Justice.

Appellant, Shane Pierson, was convicted by a Ramsey County jury on one count of first-degree murder, one count of second-degree murder, and one count of aggravated robbery.[1] Pierson raises the sole issue on appeal of whether the evidence presented at trial was sufficient as a matter of law to sustain his conviction for first-degree murder. We conclude that the evidence was sufficient, and we affirm the conviction.

On the evening of October 5, 1993, Raymond Barnett and his roommate left their home at 911 Dayton Avenue in St. Paul shortly before 10:00 p.m. and walked a block to King's Market on the corner of Selby Avenue and Milton Street. On their return home, they heard voices calling out to get their attention and saw three men running up behind them. Barnett and his roommate walked a short distance further and stopped on the sidewalk in front of their house to talk with the three men. Barnett later identified the men as appellant Shane Pierson, Carlos Smith and Antonius Hudspeth. One or two minutes later, Barnett's roommate left the

---

1. The trial court sentenced Pierson to consecutive terms of 48 months for the aggravated robbery and to life for the first degree murder.

group to go into the house, and almost immediately, the three men surrounded Barnett. At that moment, Barnett realized Smith was pointing a gun at his head. As Smith told Barnett to get on the ground, Hudspeth shouted "shoot him." During this time, Pierson was standing to one side of Barnett and did not say anything. When Barnett failed to comply with the order to get on the ground, Smith struck Barnett on the right side of his forehead with the gun, causing him to fall to the ground. Barnett believed he was "out" for a couple of seconds, and when he woke up, he was face-down in the grass and all three men were going through his clothing and beating him. One of the men was beating Barnett with some sort of stick or bat. Although Barnett could not see each individual man while he was face-down in the grass, he could feel that all three, including Pierson, participated in going through his pockets, taking his pager, ripping his pants off of him and beating him while he was on the ground. The last items taken were Barnett's tennis shoes. After the attack, the three men jogged south down the middle of Milton Street toward King's Market.

At roughly the same time, Dural Woods was standing on the corner in front of King's Market, and Michael Kirkwood had just arrived to use the telephone connected to the outside wall of the market. As Kirkwood picked up the telephone receiver, he looked up and saw three men running toward him, one of whom was carrying a pair of tennis shoes under his arm. Kirkwood and other witnesses later identified the men as Pierson, Smith and Hudspeth—the same three men identified as having robbed Barnett just moments earlier. Although the testimony conflicted somewhat, it appears that, immediately suspecting trouble, Kirkwood dropped the telephone and said "what's up" to the men four or five times. Believing he was about to be robbed, Kirkwood called to a friend across the street and stepped backwards away from the corner. As he reached his friend near the south curb of Selby Avenue, Kirkwood heard one of the men say "jack-move," a slang term for robbery, and he then saw Smith and Hudspeth hold Woods' arms while Pierson went through Woods' pockets. According to Kirkwood and his friend, Woods struggled and said "get off me." At that moment, Smith shot Woods once in the head while he was standing and three to five more times after Woods had fallen to the ground. During the shooting, Pierson stood at Woods' head and watched without attempting to leave or to stop Smith.

Immediately following the shooting, Pierson, Smith and Hudspeth jogged south on Milton Street, howling and cheering as they left. Moments later, witnesses who lived a block south of King's Market heard multiple doors slamming on a car that was parked on Milton Street south of Selby Avenue, and then saw a small tan station wagon turn the corner and proceed west on Hague Avenue at a high rate of speed. At least two occupants in the car were shouting as if in celebration and laughing raucously as they drove away.

At approximately 10:30 p.m., a "shots-fired" call was issued to St. Paul police officers in the area of Selby Avenue and Milton Street. Within minutes of the call, two officers in a patrol car spotted a brown station wagon heading north on Lexington Avenue at 40–45 miles per hour and turning west onto an I–94 access road. Having heard the call about the shooting, and because the vehicle did not slow down when it turned the corner onto the access road, the officers suspected that the occupants were trying to flee the area in a hurry. The officers followed the car onto westbound I–94 and, after receiving a description of the suspect vehicle and requesting backup assistance, stopped the car at the Riverside exit in Minneapolis. After police removed the occupants from the car, they identified the men as John Edmondson, Pierson, Smith and Hudspeth. Within an hour of the shooting, the police brought a witness of both the robbery of Barnett and the shooting of Woods to the Riverside exit, and he identified Pierson, Smith and Hudspeth as the men involved in both crimes. The car was later identified by Smith's mother as the one she had loaned to Edmondson, Pierson, Smith and Hudspeth earlier that evening, and was identified by witnesses as the one seen driving away from the scene of the shooting. Police searched

the car and recovered three pagers, one of which was the pager taken from Barnett, a baseball bat, one of Barnett's tennis shoes, and a sweatshirt. All four men were arrested.

Also within minutes of the call, police arrived at the corner of Selby Avenue and Milton Street and found Woods lying face-down on the sidewalk in a pool of blood. The police recovered from the scene four shell casings, one live round, and Barnett's second tennis shoe. A medical examiner later determined that Woods died at 10:34 p.m. from multiple gunshot wounds.

In addition to the testimony of witnesses at the scene, the trial court admitted evidence regarding Pierson's activities before and after the Woods and Barnett incidents. First, Keith Richardson testified that he had a conversation with Pierson while both were in a Ramsey County Adult Detention Center holding cell some time after Pierson's arrest on October 5th. According to the testimony, Pierson and Richardson met while in the holding cell, and Pierson told Richardson he was being held for robbery and murder. Pierson then told Richardson that he had been with another person who had a confrontation with a third man, and the third man was shot. According to Richardson, Pierson said "that he figured that the guy would have gotten shot in the shoulder or the leg or something" and that he was present at the time of the shooting.

Second, Jerrold McWilliams testified that less than two weeks before the Woods shooting, on September 22, 1993, he was robbed on the street at gunpoint, and Pierson was one of the participants in the robbery. According to McWilliams, he was walking near the corner of Marshall and Grotto Streets in St. Paul after dark, and he was approached by a man who put a gun to his head. At that point, the man was joined by three others. The gunman asked McWilliams for drugs, and McWilliams responded that he wasn't a drug dealer and didn't have any. As the other three men went through McWilliams' pockets, the gunman instructed McWilliams to take off his coat and shoes, and one of the other men took his watch. He was then pushed to the ground, and the men walked away. McWilliams later identified Pierson as one of the men who robbed him, and he specifically recalled that Pierson had "stuck his hand in my pocket."

On appeal, Pierson challenges only the sufficiency of the evidence supporting his conviction for first-degree murder. In reviewing a sufficiency of the evidence claim, this court is limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978) (citations omitted). We do not retry the facts, but instead we view the evidence in a light most favorable to the jury's verdict and assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *Id.; State v. Merrill,* 428 N.W.2d 361, 366 (Minn.1988). If the jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty, the verdict will not be disturbed. *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

Minnesota Statutes section 609.185 (1994) provides in relevant part:

> Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
>
> \*     \*     \*     \*     \*     \*
>
> (3) causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit \* \* \* aggravated robbery \* \* \*.

Although it is uncontroverted in the record that Smith actually fired the shots that killed Woods, the state contended at trial that Pierson was liable as an accomplice to the murder under Minnesota Statutes section 609.05, subdivisions 1 and 2 (1994):

**609.05 LIABILITY FOR CRIMES OF ANOTHER.**

> Subdivision 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or other-

wise procures the other to commit the crime.

Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

Under the language of these provisions, a defendant can be convicted as an accomplice under either subdivision 1 or subdivision 2; the state need not prove both.

In challenging his first-degree murder conviction, Pierson first argues that the evidence in the record is insufficient to support a finding of guilt under Minnesota Statutes section 609.05, subdivision 1.[2] Specifically, Pierson argues that the evidence shows that he and his companions intended only a series of simple street robberies and that he did not intentionally aid in the murder of Woods. Pierson asserts that his mere presence at the time of the murder is insufficient to establish the requisite mens rea of an accomplice to first-degree murder under subdivision 1.

▪ This court has reviewed section 609.05, subdivision 1 on a number of occasions to determine the scope of conduct contemplated by the language "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." It is well established that a defendant charged as an accomplice under subdivision 1 may be convicted for a murder even though he did not actively participate in the overt act that constitutes the primary offense. *Merrill,* 428 N.W.2d at 368 (citations omitted); *State v. Strimling,* 265 N.W.2d 423, 429 (Minn.1978), *reh'g denied* (Minn., March 29, 1978). Liability is imposed "for actions which affect the principal, encouraging him to take a course of action which he might not otherwise have taken." *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn. 1981). Although subdivision 1 requires something more than mere inaction or passive acquiescence to impose liability as a

principal, a jury may infer the requisite mens rea for a conviction of aiding and abetting when the defendant plays some knowing role in the commission of the crime and takes no steps to thwart its completion. *Id.; Merrill,* 428 N.W.2d at 367; *Strimling,* 265 N.W.2d at 429. Presence, companionship, and conduct before and after the offense are circumstances from which a person's participation in the criminal intent may be inferred. *Ulvinen,* 313 N.W.2d at 428.

> If the proof shows that a person is present at the commission of a crime without disapproving or opposing it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he assented to the commission of the crime, lent to it his approval, and was thereby aiding and abetting its commission.

*State v. Parker,* 282 Minn. 343, 355–56, 164 N.W.2d 633, 641 (1969). Thus, factors such as defendant's presence at the scene of the crime, defendant's close association with the principal before and after the crime, defendant's lack of objection or surprise under the circumstances, and defendant's flight from the scene of the crime with the principal may reasonably support a conviction of the defendant as an accomplice. *See Parker,* 282 Minn. at 356–57, 164 N.W.2d at 641–42; *Matter of Welfare of M.D.S.,* 345 N.W.2d 723, 733–734 (Minn.1984); *State v. Garretson,* 293 N.W.2d 44, 45 (Minn.1980).

▪ In this case, three witnesses identified Pierson as one of the men present during the shooting of Woods in front of King's Market, and Pierson does not challenge this testimony. In addition to establishing Pierson's presence, however, the record also shows: Pierson was a friend of Smith and was in Smith's company prior to and during the robbery of Barnett; Pierson was aware of Smith's possession of a gun due to the pistol-whipping of their earlier robbery victim; Pierson participated in the attempted robbery of Woods; Pierson did not object or protest when Smith first shot Woods; Pier-

---

**2.** Of course, we do not know with certainty whether the jury's first-degree murder verdict was premised on the accomplice provisions. However, because the state's theory at trial was that Smith was the gunman and Pierson was the "pocket-man," both Pierson and the state presume that the jury relied on the accomplice provisions.

son fled the scene with Smith and Hudspeth; and Pierson, along with Smith and Hudspeth, cheered as if in celebration as they left the scene of the killing. Based on this testimony of witnesses, the jury could reasonably have inferred that Pierson assented to, approved of, and played a knowing role in the killing of Woods sufficient to support a conviction as an accomplice under subdivision 1.

■ Pierson's second challenge to his conviction for first-degree murder is that the evidence is also insufficient to support a finding of guilt under Minnesota Statutes section 609.05, subdivision 2. Under subdivision 2, the state must show that: 1) the murder of Woods was committed in furtherance of the aggravated robbery; and 2) the murder was reasonably foreseeable as a probable consequence of the robbery. Minn.Stat. § 609.05, subd. 2; *Merrill,* 428 N.W.2d at 369.

In his brief to this court, Pierson does not address the state's contention that the murder was committed in furtherance of the aggravated robbery and concedes that "under applicable review standards, it would seem there was adequate evidence for the implicit jury finding that there was an attempt to rob Woods." We agree with the state's contention and conclude that the record supports a finding that the murder was committed in furtherance of the robbery, particularly because it shows that the first shot was fired just after Woods stated "get off me" and resisted the robbery effort.

In regard to the foreseeability requirement under subdivision 2, Pierson argues that although it may have been foreseeable that the gun might be discharged accidentally or might be discharged intentionally to inflict an *injury* during an escape attempt, it was not foreseeable that Smith would intentionally *kill* Woods. We disagree.

Under Minnesota law, a defendant charged as an accomplice to first-degree murder is not required to have predicted with certainty that a companion would intentionally murder the victim—only that the murder was reasonably foreseeable as a probable consequence

of the intended crime. Minn.Stat. § 609.05, subd. 2. Whether the defendant could reasonably foresee that the victim would be murdered is a question of fact for the jury. *See State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993). In making this determination, the jury is free to make reasonable inferences from the evidence, including inferences based on their experiences or common sense. *State v. Filippi,* 335 N.W.2d 739, 742 (Minn. 1983).

In this case, Pierson concedes that the evidence was sufficient to support a finding that Pierson, Smith and Hudspeth were attempting to commit an aggravated robbery of Woods. Clearly, evidence indicating the victim was murdered during the commission of an aggravated robbery is a significant factor the jury may consider in determining foreseeability.[3] In this case, additional evidence in the record also supports an inference that the murder of Woods was foreseeable. For example, Pierson was aware that Smith possessed a gun because he participated in an earlier robbery during which Smith struck the victim in the head with the gun when the victim failed to comply with Smith's order. Also, during that robbery, Hudspeth encouraged Smith to shoot the victim during the attack, perhaps indicating that at least one of the participants contemplated a shooting. And, a witness testified that after Pierson was arrested following the shooting and was placed in the detention center, Pierson told the witness that "he figured that the guy *would* have gotten shot in the shoulder or the leg or something." (emphasis added). Based on these facts, the jury could have inferred that Pierson was aware that Smith would use the gun in a manner necessary to gain the victim's compliance and that one reasonably foreseeable use would be to shoot the victim if he resisted, as was done in this case.

Thus, even if the jury could not reasonably infer that Pierson aided in Woods' murder under subdivision 1, we conclude that the jury could reasonably find that Pierson aided

---

**3.** Although the state argues that foreseeability is established by the sole fact that the men were committing an armed robbery, we are not presented with a situation in which the robbery is the only evidence suggesting the foreseeability of the victim's murder. We therefore need not determine whether an aggravated robbery in and of itself establishes foreseeability.

in the aggravated robbery of Woods under subdivision 1 and was liable as an accomplice in the murder under subdivision 2 because it was committed in pursuance of the aggravated robbery and was reasonably foreseeable as a probable consequence of the aggravated robbery.

Affirmed.