Shane PIERSON, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C8–01–1184.

Supreme Court of Minnesota.

Jan. 10, 2002.

Shane Pierson, pro se.

Mike Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Asst. Ramsey County Attorney, St. Paul, for respondent.

OPINION

LANCASTER, Justice.

Shane Pierson was convicted of first- and second-degree murder and aggravated robbery for his involvement in the robbery of Raymond Barnett and the murder of Dural Woods. Pierson appealed his first-degree murder conviction to this court, claiming that the evidence presented by the state at trial was insufficient as a matter of law to sustain the conviction. *State v. Pierson,* 530 N.W.2d 784, 785 (Minn.1995). We rejected Pierson's argument and affirmed his conviction. *Id.* at 789–90.

More than five years later, Pierson filed a pro se petition for postconviction relief pursuant to Minn.Stat. §§ 590.01–.06 (2000). His petition sets forth three claims: (1) that there is newly discovered evidence in the form of previously unavailable accomplice testimony; (2) that the trial court improperly admitted *Spreigl* evidence of his involvement in a prior robbery; and (3) that he was deprived of his constitutional right to effective assistance of appellate counsel. The postconviction court issued an order summarily dismissing Pierson's petition. This case comes before the court on Pierson's appeal of the postconviction court's order. We affirm.

I.

A detailed statement of the facts can be found in *Pierson,* 530 N.W.2d at 785–87; therefore, we will set out only the facts relevant to this appeal. Shortly before 10 p.m. on October 5, 1993, Barnett and his roommate left King's Market, located on the corner of Milton Street and Selby Avenue in Saint Paul, Minnesota, and started walking toward their house on Dayton Avenue. En route, they heard voices shouting at them and saw three men running toward them. Barnett and his roommate stopped to talk with the three men—later

identified by Barnett as Pierson, Carlos Smith, and Antonius Hudspeth—in front of their house at 911 Dayton. One or two minutes later, Barnett's roommate went inside, leaving Barnett with Pierson, Smith, and Hudspeth. The three men surrounded Barnett. Smith put a gun to Barnett's head and told him to get on the ground. Hudspeth urged Smith to shoot Barnett.

Smith then hit Barnett in the forehead with his gun, knocking him out for a couple of seconds. When Barnett regained consciousness, he was facedown on the ground and all three men were going through his pockets and beating him. According to Peter Hajjar, who observed the robbery from across the street, all three men contributed to the beating, kicking him and using what looked like a stick or baseball bat. The men ripped off Barnett's jeans and took his pager and shoes before heading toward King's Market on Milton.

Meanwhile, Woods and Michael Kirkwood were standing outside King's Market. Kirkwood saw three men he later identified as Pierson, Smith, and Hudspeth running toward him and immediately suspected that he was about to be robbed. According to Kirkwood, he briefly confronted the men and then called out to his friend across the street. As Kirkwood was stepping away from the men toward his friend, he heard one of them say "jackmove," a slang term for robbery. Kirkwood testified that he then saw Smith and Hudspeth lift up Woods's arms and saw Pierson go through Woods's pockets. Both Kirkwood and his friend testified that Woods shouted "get off me," that Smith then shot Woods in the head, and that Smith shot Woods multiple times after he had fallen to the ground. Pierson stood near Woods's head and watched as Smith fired the shots.

Hajjar offered a slightly different account of the Woods murder. Although his view of the murder scene was partially obstructed at the moment Woods was shot, Hajjar was able to testify that he heard gunshots only one or two seconds after the three men got to the intersection of Milton and Selby.

After the shooting, Pierson, Smith, and Hudspeth laughed, cheered, and howled as they made their way south on Milton to a waiting brown station wagon. Witnesses heard the occupants of the station wagon cheer and laugh as it sped away toward Interstate Highway 94. The station wagon was eventually pulled over by the Saint Paul police near the Riverside exit of I-94 west, where officers identified Pierson, Smith, Hudspeth, and John Edmondson, the driver of the vehicle. A search of the station wagon uncovered, among other things, Barnett's pager, one of his shoes,[1] and a baseball bat.

At trial, the state introduced *Spreigl* evidence of Pierson's participation in the September 22, 1993, robbery of Jerrold McWilliams. McWilliams testified that a man approached him and put a gun to his head as he was walking after dark near the corner of Grotto Street and Marshall Avenue in Saint Paul. According to McWilliams, the gunman was then joined by three other men. After the men went through McWilliams's pockets, the gunman instructed him to remove his jacket, one of them told him to take off his shoes, and one of them took his watch. McWilliams was then pushed to the ground, and the men walked away. McWilliams later identified Pierson as one of the men who robbed him, and he specifically recalled that Pierson had "stuck his hand in my pocket."

1. Officers found Barnett's other shoe at the     scene of Woods's murder.

The defense theory at trial was that Pierson did not aid and abet Smith in the murder of Woods. According to the defense, Smith impulsively and spontaneously shot Woods as Pierson, Smith, and Hudspeth left the scene of the Barnett robbery.

The jury returned guilty verdicts on three counts: first-degree murder in violation of Minn.Stat. §§ 609.185(3) (1992), 609.05 (2000); second-degree murder in violation of Minn.Stat. §§ 609.19(2) (1992), 609.05; and aggravated robbery in violation of Minn.Stat. §§ 609.245 (1992), 609.05. Pierson was sentenced to 48 months' imprisonment on the aggravated robbery conviction and given a consecutive life sentence for first-degree murder.

Pierson appealed, arguing that there was insufficient evidence to sustain his first-degree murder conviction. *Pierson*, 530 N.W.2d at 785. After reviewing the evidence presented by the state at trial, this court rejected Pierson's insufficient evidence claim and affirmed his first-degree murder conviction in an opinion dated May 5, 1995. *Id.* at 789–90.

On December 8, 2000, Pierson filed a pro se petition for postconviction relief pursuant to Minn.Stat. §§ 590.01–.06. Pierson's petition raises three claims: (1) that he is entitled to a new trial or an evidentiary hearing due to the presence of newly discovered evidence; (2) that the trial court improperly admitted *Spreigl* evidence of his involvement in the McWilliams robbery; and (3) that his constitutional right to effective assistance of appellate counsel was violated when his appellate counsel failed to raise the newly discovered evidence and *Spreigl* issues on direct appeal.

The postconviction court summarily dismissed Pierson's petition. The court identified three reasons to dismiss the newly discovered evidence claim: that the evidence "could have been available to [Pierson] or his counsel at the time of trial"; that Smith, the source of the new evidence, "is not a credible source"; and that "there is no basis whatsoever to believe that the proposed evidence would create a different result."

With respect to Pierson's *Spreigl* evidence claim, the postconviction court concluded that Pierson could have raised the claim on direct appeal. Because Pierson failed to do so, the court reasoned, he was procedurally barred from having the issue considered on a subsequent petition for postconviction relief. The court also noted that Pierson could have raised the issue himself on direct appeal by filing a supplemental pro se brief.

Finally, as to the ineffective assistance of appellate counsel claim, the court found that Pierson received "excellent assistance of counsel," and that his counsel could have raised the *Spreigl* evidence issue on direct appeal had he perceived it to be a meritorious claim.

## II.

■ A petition for postconviction relief is a collateral attack on a conviction that enjoys a presumption of regularity. *Hummel v. State*, 617 N.W.2d 561, 563 (Minn. 2000). A postconviction court must hold a hearing on the petition "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2000).

■ A postconviction court's findings are reviewed to determine whether there is sufficient evidentiary support in the record. *Dukes v. State*, 621 N.W.2d 246, 251 (Minn.2001); *Russell v. State*, 562 N.W.2d 670, 672 (Minn.1997). This court affords "great deference to a district court's findings of fact and will not reverse the find-

ings unless they are clearly erroneous." *Dukes,* 621 N.W.2d at 251; *see State v. Bradford,* 618 N.W.2d 782, 794 (Minn. 2000). The decisions of a postconviction court will not be disturbed absent an abuse of discretion. *Dukes,* 621 N.W.2d at 251; *Perry v. State,* 595 N.W.2d 197, 200 (Minn. 1999). Each of Pierson's claims of error in the postconviction court's findings must be reviewed under this standard. *See Dukes,* 621 N.W.2d at 251.

### III.

■ Pierson's first claim is that he should be granted a new trial or an evidentiary hearing to present newly discovered evidence. This evidence takes the form of testimony by Smith, the gunman in the Barnett robbery and Woods murder. Pierson claims to have "discovered" Smith's testimony upon reading the transcripts from the trial of Edmondson, the driver of the station wagon. The essence of the testimony given by Smith at Edmondson's trial is as follows: Edmondson drove Pierson, Smith, and Hudspeth to Saint Paul to purchase marijuana on October 5, 1993. According to Smith, Edmondson was unaware that Smith was going to commit a robbery, Edmondson did not know that Smith had a gun, and Smith never discussed the possibility of committing a robbery with Edmondson, Hudspeth, or Pierson. The postconviction court concluded that Smith's testimony "could have been available to [Pierson] or his counsel at the time of trial," that Smith "is not a credible source," and that "there is no basis whatsoever to believe that the proposed evidence would create a different result."

■■ A petitioner seeking postconviction relief has the burden of establishing,

by a fair preponderance of the evidence, facts that would warrant a reopening of the case. *State v. Warren,* 592 N.W.2d 440, 449 (Minn.1999). Newly discovered evidence can serve as the basis for a new trial only when the petitioner proves that: (1) the evidence was not known to the defendant or counsel at the time of trial; (2) the failure to learn of the evidence prior to trial was not due to a lack of diligence; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence will probably produce either an acquittal or a more favorable result. *Woodruff v. State,* 608 N.W.2d 881, 888 (Minn.2000); *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997).

Pierson has failed to establish that the substance of Smith's testimony was unknown to him at the time of his trial. The evidence clearly shows that Pierson and Smith were together throughout the events of October 5, 1993. Thus, Pierson undoubtedly knew that Smith had information regarding Pierson's involvement in those events.

The fact that Smith may have been unavailable to testify at Pierson's trial does not change this result. This point is well illustrated by *Warren.* In that case, petitioner Warren argued that the testimony of Towle, his accomplice, constituted newly available evidence entitling him to a new trial. *Warren,* 592 N.W.2d at 449. Warren had subpoenaed Towle to testify at his trial, but Towle invoked the Fifth Amendment due to the charges pending against him.[2] *Warren,* 592 N.W.2d at 450. After Towle was tried and convicted, he submitted an affidavit in support of Warren's petition that indicated his willingness to

---

**2.** In this case, it is unclear from the record whether Pierson subpoenaed Smith to testify at his trial.

testify.[3] *Id.* at 446–47. We held that Warren did not "clear the hurdle of showing that the evidence was unknown to him at the time of trial," even though Towle was unavailable to testify at that time. *Id.* at 450.

The postconviction court's finding that Smith is not a credible source also finds ample support in the record. To begin, Smith was convicted of aggravated robbery and first- and second-degree murder in connection with the Barnett robbery and Woods murder. *State v. Smith,* 541 N.W.2d 584, 586 (Minn.1996). Already serving a life sentence for murder, Smith would have little to lose by providing testimony exculpating his accomplices. Furthermore, on cross-examination by the state at Edmondson's trial, Smith admitted to having two prior felony convictions for sale of cocaine. Cross-examination also revealed that Smith lied to the police shortly after his arrest when he was asked about Edmondson. Given this background, the postconviction court's conclusion regarding Smith's lack of credibility is well founded.

Finally, the addition of Smith's testimony would probably not change the result reached in Pierson's trial. The focus of Smith's testimony was Edmondson's lack of participation in the October 5, 1993, crimes. The testimony contains only a small quantity of information concerning Pierson's participation in those events. The portion of Smith's testimony dealing directly with Pierson reads:

Q: And you discussed with Mr. Edmondson and Mr. Hudspeth and Mr. Pierson what you had planned on doing, didn't you?

A: No, I did not.

While this evidence is probative of the issue of intent to aid and abet with respect to Edmondson—who remained in the station wagon during the Barnett robbery and Woods murder—it has very little probative value with respect to Pierson. It is clear that Pierson directly participated in the robbery of Barnett and that Smith used a gun during commission of that robbery. In addition, based on the evidence presented at trial, the jury found that Pierson was more than just an innocent bystander in the murder of Woods, a determination that was affirmed by this court on direct appeal. *Pierson,* 530 N.W.2d at 789–90. In light of this evidence, Smith's statement that the men never discussed the possibility of committing robbery or murder is insignificant. Thus, we cannot say that the addition of Smith's testimony would produce an acquittal or a more favorable result, and we hold that the postconviction court did not abuse its discretion in summarily dismissing Pierson's newly discovered evidence claim.

## IV.

Pierson's second claim is that the trial court violated his right to a fair trial by erroneously admitting *Spreigl* evidence of his involvement in the McWilliams robbery. The postconviction court concluded that this claim was procedurally barred under *State v. Knaffla,* 309 Minn. 246, 243 N.W.2d 737 (1976).

Any claim known by a defendant but not raised on direct appeal will not be considered on a subsequent petition for postconviction relief. *Dukes,* 621 N.W.2d at 257; *Knaffla,* 309 Minn. at 252, 243 N.W.2d at 741. A petitioner is procedurally barred from raising an issue in a

---

**3.** In contrast, Pierson has not presented any information indicating that Smith would be willing to testify in his defense.

postconviction proceeding under this rule if he "knew or should have known about the issue at the time of [direct] appeal." *Sutherlin v. State*, 574 N.W.2d 428, 432 (Minn.1998); *see Black v. State*, 560 N.W.2d 83, 85 (Minn.1997). This procedural bar does not apply if a claim is so novel that its legal basis was not reasonably available at the time the direct appeal was taken or, in limited situations, if fairness so requires and the petitioner did not "deliberately and inexcusably" fail to raise the issue on direct appeal. *Dukes*, 621 N.W.2d at 251; *Roby v. State*, 531 N.W.2d 482, 484 (Minn.1995).

Pierson did not raise his objection to the trial court's admission of *Spreigl* evidence on direct appeal. *Pierson*, 530 N.W.2d at 785. The legal basis for such a claim is not novel. *See, e.g., State v. Bolte*, 530 N.W.2d 191, 196–99 (Minn.1995) (discussing criminal defendant's challenge to the admissibility of evidence of defendant's participation in other crimes); *State v. Klotter*, 274 Minn. 58, 62–63, 142 N.W.2d 568, 571–72 (1966) (same); *State v. Spreigl*, 272 Minn. 488, 490–97, 139 N.W.2d 167, 169–73 (1965) (same). As noted by the postconviction court, Pierson could have raised the issue himself on direct appeal by filing a pro se supplemental brief. Furthermore, this is not the type of situation in which fairness requires consideration of Pierson's claim. We hold that the postconviction court did not abuse its discretion in deciding that Pierson's *Spreigl* claim is procedurally barred.

## V.

■ Pierson's final claim is that he was deprived of his constitutional right to effective assistance of appellate counsel. The basis for this claim is his appellate counsel's failure to raise the newly discovered evidence and *Spreigl* evidence issues on direct appeal. The postconviction court found "absolutely no basis in law or fact for this claim."

■ The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). To establish a claim of ineffective assistance of counsel, a defendant must meet a two-pronged test evaluating deficiency and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Dukes*, 621 N.W.2d at 252. First, the defendant must show by a preponderance of the evidence that counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052; *Dukes*, 621 N.W.2d at 252. In *State v. Doppler*, 590 N.W.2d 627 (Minn.1999), this court explained that "[i]n Minnesota, an attorney acts within the objective standard of reasonableness when he provides his client with the representation of an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under the circumstances." *Id.* at 633 (quotation omitted). There is a strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *see Dukes*, 621 N.W.2d at 252.

■ Second, the defendant must show by a preponderance of the evidence that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Dukes*, 621 N.W.2d at 252. In the context of a claim of ineffective assistance of appellate counsel, a defendant "must be able to show that absent his appellate counsel's error, the outcome of his direct appeal would have been different." *Dukes*, 621 N.W.2d at 256.

■ When an appellant and counsel have divergent opinions as to what issues

should be raised on appeal, counsel has no duty to include claims that would detract from other more meritorious issues. *Hummel,* 617 N.W.2d at 566; *Sutherlin,* 574 N.W.2d at 435. As discussed above, Pierson's newly discovered evidence claim lacks merit. Thus, his appellate counsel did not provide ineffective assistance of counsel by deciding not to pursue the issue. *See Hummel,* 617 N.W.2d at 566; *Sullivan v. State,* 585 N.W.2d 782, 785 (Minn.1998); *Sutherlin,* 574 N.W.2d at 435.

An analysis of Pierson's *Spreigl* claim reveals that it, too, lacks merit and, therefore, appellate counsel did not render ineffective assistance of counsel by choosing to focus on other issues. Under Minn. R. Evid. 404(b), evidence of other crimes, wrongs, or acts is admissible for a number of limited purposes. Trial courts may admit *Spreigl* evidence if they find that (1) the evidence is clear and convincing that the defendant participated in the *Spreigl* incident, (2) the *Spreigl* evidence is relevant and material to the state's case, and (3) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice. *State v. Robinson,* 604 N.W.2d 355, 363 (Minn.2000); *State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991). In this case, the state offered evidence of Pierson's robbery of McWilliams for the purpose of showing intent, modus operandi, knowledge, and common plan and scheme.

We conclude that Pierson's participation in the *Spreigl* incident was established by clear and convincing evidence. The state presented direct evidence of Pierson's involvement in the McWilliams robbery. McWilliams identified Pierson from a photo lineup as one of the men who robbed him, and testified that it was Pierson who stuck his hand in his pocket during the robbery.

We also conclude that the *Spreigl* evidence was relevant and material to the state's case. "In determining the relevance and materiality of *Spreigl* evidence, 'the trial court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi.'" *State v. Lynch,* 590 N.W.2d 75, 80 (Minn.1999) (quoting *State v. DeBaere,* 356 N.W.2d 301, 305 (Minn.1984)). While the mere fact that the prior crime was of the same generic type as the charged offense usually is not sufficient to establish a close relationship, it is not necessary that the crimes be "signature" crimes. *State v. Cogshell,* 538 N.W.2d 120, 123 (Minn.1995).

The McWilliams robbery occurred on September 22, 1993, less than two weeks before the Barnett robbery and Woods murder. The location of the McWilliams robbery—near the corner of Grotto and Marshall in Saint Paul—is near the scene of the October 5, 1993, crimes. Finally, the McWilliams robbery, Barnett robbery, and Woods murder share a common modus operandi. In each case, several men surrounded the victim, with one of them placing a gun to the victim's head. Moreover, Pierson was identified as a "pocketman" in each of the incidents.

The main issue at Pierson's trial was whether he was an intentional participant in the murder of Woods. The evidence that Pierson intentionally participated in a somewhat similar armed robbery less than two weeks earlier is relevant evidence tending to rebut Pierson's claim that he did not intentionally participate in the Woods murder. *See State v. Hudspeth,* 535 N.W.2d 292, 295 (Minn.1995).

Finally, we conclude that the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair

prejudice. In weighing the probative value of *Spreigl* evidence against its prejudicial effect, "the court must consider how crucial the *Spreigl* evidence is to the state's case." *Robinson,* 604 N.W.2d at 363; *see Lynch,* 590 N.W.2d at 81.

There was conflicting testimony at trial on the issue of whether Pierson was an active participant in Woods's murder. Kirkwood testified that Smith and Hudspeth held up Woods's arms, and that Pierson went through Woods's pockets just before Smith shot him. The testimony of Kirkwood's friend, which included the statement that Woods shouted "get off me" just before he was shot, could be construed as comporting with Kirkwood's version of events. On the other hand, Hajjar stated that Woods was shot just one or two seconds after Pierson, Smith, and Hudspeth reached the corner of Milton and Selby. The sequence of events described by Kirkwood could not have taken place in such a short period of time. Given the conflicting testimony on this point, the *Spreigl* evidence showing that Pierson acted as a "pocketman" in previous robberies was crucial to the state's case, and its probative value was not outweighed by its potential for unfair prejudice.

In sum, all of the requirements for admission of *Spreigl* evidence were met in this case. Thus, Pierson's appellate counsel did not provide ineffective assistance of counsel by failing to raise this nonmeritorious issue on direct appeal. *See Hummel,* 617 N.W.2d at 566; *Sullivan,* 585 N.W.2d at 785; *Sutherlin,* 574 N.W.2d at 435. The postconviction court's decision to summarily dismiss this claim is not an abuse of discretion.

Affirmed.